# EXHIBIT A

 **Service of Process Transmittal**
02/28/2022
CT Log Number 541129337

**TO:** Paul Bech
Chubb
436 Walnut St
Philadelphia, PA 19106-3703

**RE:** **Process Served in South Carolina**

**FOR:** Federal Insurance Company (Domestic State: IN)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | DOWNWIND TRADING COMPANY, INC., d/b/a DAMON'S GRILL vs. FEDERAL INSURANCE COMPANY |
| **DOCUMENT(S) SERVED:** | Letter, Summons, Complaint, Attachment(s) |
| **COURT/AGENCY:** | Horry County Court of Common Pleas, SC<br>Case # 2022CP2600971 |
| **NATURE OF ACTION:** | Insurance Litigation |
| **ON WHOM PROCESS WAS SERVED:** | CT Corporation System, Columbia, SC |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 02/28/2022 postmarked: "Not Post Marked" |
| **JURISDICTION SERVED :** | South Carolina |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | Andrew J. D'Antoni<br>WILLOUGHBY & HOEFER, P.A.<br>P.O. Box 8416<br>Columbia, SC 29202<br>803-252-3300 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 02/28/2022, Expected Purge Date: 03/05/2022<br><br>Image SOP<br><br>Email Notification, Incoming Legal incominglegal@chubb.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System<br>2 Office Park Court<br>Suite 103<br>Columbia, SC 29223<br><br>800-448-5350<br>MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

STATE OF SOUTH CAROLINA
**DEPARTMENT OF INSURANCE**
P.O. BOX 100105
COLUMBIA, S.C. 29202-3105

9489 0090 0027 6280 2506 74
Label 890-PB, Oct. 2015
Pitney Bowes

**CERTIFIED MAIL**

SERVICE OF PROCESS

Federal Insurance Company
c/o CT Corporation System
2 Office Park Court, Suite 103
Columbia, SC 29223

ÇOL



# South Carolina Department of Insurance

HENRY McMASTER
Governor

RAYMOND G. FARMER
Director

February 17, 2022

CERTIFIED MAIL
RETURN RECEIPT REQUESTED
FEDERAL INSURANCE COMPANY
c/o CT Corporation System
2 Office Park Court, Suite 103
Columbia, SC 29223-0000

Dear Sir:

On February 17, 2022, I accepted service of the attached Summons and Complaint on your behalf. I am, hereby, forwarding that accepted process on to you pursuant to the provisions of S.C. Code Ann. § 38-5-70. By forwarding accepted process on to you, I am meeting a ministerial duty imposed upon me by S.C Code Ann. § 15-9-270. I am not a party to this case. The State of South Carolina Department of Insurance is not a party to this case. The claimant, within this service letter, provided the following additional information regarding this first party claim: POLICY/CLAIM NUMBER 8242-5843. It is important for you to realize that service was effected upon your insurer on my date of acceptance for service.

**You must promptly acknowledge in writing your receipt of this accepted process to spurvis@doi.sc.gov**. When replying, please refer to File Number 187940, Downwind Trading Company, Inc., d/b/a Damons Grill v. FEDERAL INSURANCE COMPANY, 2022-CP-26-00971.

By:

Gwendolyn McGriff
General Counsel
(803)737-6732

Sincerely Yours,

Raymond G. Farmer
Director
State of South Carolina
Department of Insurance

Attachment

CC: Andrew J. Antoni
Post Office box 8416
Columbia, SC 29202

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FOR THE FIFTEENTH JUDICIAL CIRCUIT

DOWNWIND TRADING COMPANY, INC., d/b/a DAMON'S GRILL

Plaintiff,

v.

FEDERAL INSURANCE COMPANY, d/b/a CHUBB,

Defendant.

C/A NO. 2022-CP-__-_____

**SUMMONS**

TO THE DEFENDANT ABOVE NAMED:

**YOU ARE HEREBY SUMMONED** and required to answer the Complaint herein, a copy of which is herewith served upon you, and to serve a copy of your answer to this Complaint upon the subscriber, at his office, 930 Richland Street, Columbia, SC 29201, within thirty (30) days after service hereof, exclusive of the day of such service, and if you fail to answer the Complaint within the time aforesaid, or otherwise appear and defend, judgment by default will be rendered against you for the relief demanded in the Complaint.

Respectfully,

s/Andrew J. D'Antoni
Mitchell Willoughby (S.C. Bar No. 6161)
Andrew J. D'Antoni (S.C. Bar No. 100919)
**WILLOUGHBY & HOEFER, P.A.**
P.O. Box 8416
Columbia, SC 29202
(803) 252-3300
mwilloughbyhoefer@willoughbyhoefer.com
adantoni@willoughbyhoefer.com

*Attorneys for Plaintiff Downwind Trading Company, Inc., d/b/a Damon's Grill*

February 15, 2022
Columbia, South Carolina

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

| STATE OF SOUTH CAROLINA<br>COUNTY OF HORRY | IN THE COURT OF COMMON PLEAS<br>FOR THE FIFTEENTH JUDICIAL CIRCUIT |
|---|---|
| DOWNWIND TRADING COMPANY, INC., d/b/a DAMON'S GRILL<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL INSURANCE COMPANY, d/b/a CHUBB,<br><br>Defendant. | C/A NO. 2022-CP-__-_____<br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

Plaintiff Downwind Trading Company, Inc., d/b/a Damon's Grill ("Downwind"), complains of Defendant Federal Insurance Company, d/b/a Chubb ("Chubb") and respectfully alleges as follows:

**INTRODUCTION**

1. This action is for breach of contract, bad faith and/or unreasonable refusal to pay insurance claim, and declaratory judgment arising out of Chubb's unreasonable, deliberate, and malicious denial of coverage under insurance policies sold to Downwind.

2. Downwind is the owner and operator of an excellent restaurant and bar known as Damon's Grill, located at 2985 South Ocean Boulevard, Myrtle Beach, South Carolina. With the growing threat of computer fraud, on or about January 16, 2019, Chubb sold to Downwind and made Downwind the named insured under Chubb's ForeFront Portfolio 3.0, Crime Coverage Part, Policy, Policy No. 8242-5843 ("Chubb Policy"), which specifically provides coverage for losses resulting from "Computer Fraud," "Funds Transfer Fraud," and "Forgery," among other coverages.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

3. In the summer of 2019, Downwind became the victim of a computer fraud (the " Fraud") in which the perpetrator of the Fraud (the "Hacker"), through the use of a computer, surreptitiously infiltrated the email account of the President of Downwind (the "Executive Email Account") without authorization and then used this unauthorized access to, among other things, send forged and fraudulent emails purporting to be from Downwind's President, Mr. Bart Buie ("Mr. Buie"), for the purpose of misdirecting the deposit of proceeds from certain credit card sales at Damon's Grill into an unauthorized bank account at BBVA Compass Bank (the "Scam Bank Account"). This Fraud directly and proximately caused significant financial loss to Downwind.

4. Downwind purchased the Chubb Policy, and the policy is so designed, to protect Downwind against precisely the type of loss it has now incurred because of the Fraud. Yet, even though Downwind paid its premiums, gave prompt notice of the Fraud to Chubb, and cooperated with follow-on investigative efforts, Chubb unreasonably, deliberately, and maliciously refused, and continues to refuse, to pay Downwind's claim for coverage under the policy (the "Claim").

5. Accordingly, Downwind seeks actual, consequential, and punitive damages, plus attorney fees, pre- and post- judgment interest, costs, and litigation expenses for breach of contract and for Chubb's bad faith and/or unreasonable, deliberate, and malicious refusal to pay an insurance claim, as well as a declaration that there is coverage for the Claim under the Chubb Policy.

**PARTIES, JURISDICTION, AND VENUE**

6. Downwind is a restaurant business organized under the laws of the State of South Carolina with its principal place of business in the City of Myrtle Beach, in the County of Horry, South Carolina and is subject to the jurisdiction of this Court pursuant to South Carolina law.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

7.     Upon information and belief, Chubb is an insurance company organized under the laws of the State of Indiana, which has conducted and continues to conduct substantial insurance business in South Carolina, including, *inter alia*, selling the policy of insurance that is the subject of this Complaint against Chubb to Downwind in Horry County. Upon information and belief, Chubb is licensed under South Carolina law to transact insurance business in the State of South Carolina, is registered with the South Carolina Department of Insurance, and, pursuant to S.C. Code Ann. 38-5-70, has appointed the Director of the South Carolina Department of Insurance to be its true and lawful attorney upon whom all legal process in any action filed in South Carolina against Chubb must be served. Accordingly, Chubb is subject to the jurisdiction of this Court pursuant to South Carolina law.

8.     Venue is proper in Horry County, South Carolina because Downwind's principal place of business is, and at all times relevant hereto has been, in Horry County; the policy of insurance that is the subject of this Complaint was issued and sold by Chubb to Downwind in Horry County; Chubb engages in its insurance business on a daily basis in Horry County; and key acts and omissions by Chubb giving rise to this Complaint occurred in Horry County.

## STATEMENT OF FACTS

### A. Downwind is the Victim of a Fraud

9.     Operating under the name "Damon's Grill," Downwind has for many years run one of the most popular and iconic restaurants in the City of Myrtle Beach and County of Horry, South Carolina. Ideally located on the waterfront along South Ocean Boulevard, tourists have flocked for nearly three decades to Damon's Grill for its superb food, fun atmosphere, and panoramic ocean views.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

10.     In July 2019, Downwind was in the process of transitioning its point-of-sale ("POS") credit card transaction processing systems to Shift4 Payments, LLC ("Shift4"), a nationwide provider of payment processing and POS services. As part of this transition and to establish a merchant account with Shift4, Downwind was instructed by Shift4 to provide it with bank account information for purposes of directing the deposit of credit card sales proceeds at the restaurant into Downwind's designated bank account.

11.     Unbeknownst to Downwind at the time, the Executive Email Account had been compromised by the Hacker, who then used his unauthorized access to, among other things, intercept and view email correspondence between Downwind and Shift4 and then insert himself into communications between Downwind and Shift4 by surreptitiously sending to Shift4 fraudulent and forged emails from the Executive Email Account that purported to be from Mr. Buie.

12.     On or about July 23, 2019 at 5:14 PM, Shift4 received a fraudulent and forged email from the Executive Email Account sent by a person purporting to be Mr. Buie (but was actually the Hacker) directing the deposit of credit card sales at the restaurant into the Scam Bank Account (the "Fraudulent Email").

13.     Attached to the Fraudulent Email was a void check made upon the Scam Bank Account. The void check had been fraudulently altered on its face to make it appear that Downwind owned the Scam Bank Account (when, in fact, Downwind did not own and has never owned a bank account at BBVA Compass Bank).

14.     Relying on the Fraudulent Email, Shift4 set up the POS credit card processing system to deposit credit card sale proceeds at the restaurant into the Scam Bank Account. The POS system then went active on or about August 12, 2019.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

15.    On or about August 21, 2019, Downwind became concerned when credit card sales proceeds at the restaurant were not deposited into its legitimate bank account with TD Bank and contacted Shift4 to inquire into the status of the deposits.

16.    Downwind discovered that from on or about August 12, 2019, through on or about August 20, 2019, $137,174.65 in credit card sales proceeds at the restaurant had been deposited into the Scam Bank Account.

17.    Downwind immediately worked with Shift4 to ensure that future deposits of POS credit card sales proceeds at the restaurant would be made into Downwind's legitimate bank account at TD Bank.

18.    In addition to the fraudulent loss of credit card proceeds, on or about September 11, 2019, a chargeback was sent to Downwind on an earlier $2,550.00 American Express credit card transaction processed in its POS system on grounds that it was fraudulent, and that amount was subsequently deducted by Shift4 from Downwind's legitimate bank account with TD Bank. Downwind subsequently learned that the $2,550.00 fraudulent charge had also been deposited into the Scam Bank Account.

19.    A subsequent investigation confirmed that Downwind was the victim of computer fraud; that fraudulent and forged emails had been sent from the Executive Email Account purporting to be Mr. Buie, causing credit card sales proceeds at the restaurant to be deposited into the Scam Bank Account; that other emails between Downwind and Shift4 had been intercepted, altered, and/or spoofed; and that the Executive Email Account had been compromised by a fraudster using one or more computers. Downwind is informed and believes that Chubb is aware of the subsequent investigation and its findings.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

20. As a direct and proximate result of the Fraud, Downwind suffered losses of $137,174.65 in credit card sales proceeds from its restaurant; $2,550.00 in a chargeback on a fraudulent American Express credit card transaction; forensic investigation expenses; attorneys' fees; loss of the use of the stolen funds; and other damages.

**B. Chubb's Crime Coverage Policy**

21. In consideration of premiums paid to cover exactly the type of loss at issue here, Chubb sold the Chubb Policy to Downwind for the policy period April 1, 2019, to April 1, 2020. Reference is hereby craved to the terms of the Chubb Policy, attached hereto as Exhibit A and incorporated herein by this reference.

22. The Chubb Policy provides coverage for a wide variety of criminal and fraudulent activity, including, among other coverages, "Computer Fraud Coverage," "Funds Transfer Fraud Coverage," and "Forgery Coverage."

23. The Chubb Policy provides "Limits of Liability" for its Computer Fraud Coverage, Funds Transfer Fraud Coverage, and Forgery Coverage of $250,000.

24. The Chubb Policy provides "Computer Fraud Coverage" for "direct loss of **Money**, **Securities** or **Property** sustained by an **Insured** resulting from **Computer Fraud** committed by a **Third Party**."[1]

25. **Money** is defined as "currency, coin bank notes and bullion."

26. **Insured** is defined as "any **Organization** and any **Sponsored Plan**." **Organization** is defined as "the **Parent Organization**," and **Parent Organization** is defined as "the entity named in Item 1 of the GTC Declarations." Item 1 of the GTC Declarations lists "Downwind Trading Co, Inc DBA Damons Grill of Myrtle Beach."

[1] All emphasized terms appear in boldface in the Chubb Policy.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

27.    **Third Party** is defined as "a natural person other than (A) an **Employee**; or (B) a natural person acting in collusion with an **Employee**."

28.    **Computer Fraud** is defined as "the unlawful taking of **Money**, **Securities** or **Property** resulting from a **Computer Violation**."

29.    **Computer Violation** includes, in relevant part, an "unauthorized: (A) entry into … a **Computer System** … directed solely against an **Organization**."

30.    The Chubb Policy definition of "**Computer System** means a computer … including its input, output, processing, storage and communications facilities."

31.    The Chubb Policy also provides "Funds Transfer Fraud Coverage" for the "Direct loss of **Money** or **Securities** sustained by an **Insured** resulting from **Funds Transfer Fraud** committed by a **Third Party**."

32.    "**Funds Transfer Fraud** means fraudulent written [or] electronic … instructions … purportedly issued by an **Organization**, and issued to a financial institution directing such institution to transfer … **Money** or **Securities** from any account maintained by such **Organization** at such institution, without such **Organization's** knowledge or consent."

33.    Additionally, the Chubb Policy provides "Forgery Coverage" for "direct loss sustained by an **Insured** resulting from **Forgery** or alteration of a **Financial Instrument** committed by a **Third Party**."

34.    **Forgery** is defined as "the signing of another natural person's name with the intent to deceive … Mechanically or electronically produced or reproduced signatures shall be treated the same as hand-written signatures."

35.    A **Financial Instrument** is defined as "checks … that are made, drawn by or drawn upon an **Organization** … or that are purported to have been so made or drawn."

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

C. **Chubb's Denial of Coverage**

36. On or about September 13, 2019, Downwind notified Chubb of the Fraud and made a Claim for coverage under the Chubb Policy.

37. Coverage exists under the Computer Fraud Coverage provision because there was a "direct loss of **Money**, **Securities**, or **Property** sustained by [Downwind] resulting from" the Hacker's "unauthorized: (A) entry into … a **Computer System** … directed solely against [Downwind]."

38. The Hacker, who was not an employee of Downwind, through the use of a computer, made unauthorized entry into a **Computer System** by invading through deception the Executive Email Account to carry-out the Fraud directed solely against Downwind that directly and proximately resulted in significant loss to Downwind.

39. The Hacker, through the use of a computer, used his unauthorized access to the Executive Email Account, on or about late July 2019, to send one or more forged and fraudulent emails pretending to be Mr. Buie to Shift4 that directly and proximately resulted in the misdirection and deposit of $137,174.65 in credit card sales proceeds at the restaurant into the Scam Bank Account.

40. Further, the Hacker, through the use of a computer, used his unauthorized access to the Executive Email Account to infiltrate the POS system to process and deposit a $2,550.00 fraudulent American Express credit card charge into the Scam Bank Account that was later charged back against Downwind's legitimate bank account with TD Bank.

41. In sum, there were one or more **Computer Violations**, and because these **Computer Violations** resulted in a fraudulently induced transfer and loss of **Money**, **Securities**,

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

or **Property** that belonged to Downwind, there was **Computer Fraud** falling within the Computer Fraud Coverage of the Chubb Policy.

42.     Moreover, coverage also exists under the Funds Transfer Fraud Coverage provision because there was a "direct loss of **Money** or **Securities** sustained by [Downwind] resulting from" a "fraudulent written [or] electronic … instruction[ ] … purportedly issued by [Downwind], and issued to [Shift4] directing [Shift4] to transfer, pay or deliver **Money** or **Securities** from an[ ] account maintained by [Downwind] at [Shift4], without [Downwind's] knowledge or consent."

43.     Downwind maintained an account with Shift4. The Hacker, through the use of a computer, used his unauthorized access to the Executive Email Account beginning in or about late July 2019 and continuing into August 2019, to send forged and fraudulent emails pretending to be Mr. Buie to Shift4 that directly and proximately resulted in the fraudulent transfer of $137,174.65 in credit card sales from the aforesaid account into the Scam Bank Account without Downwind's knowledge or consent.

44.     Accordingly, there was a **Funds Transfer Fraud**, and because this **Funds Transfer Fraud** resulted in **Money** or **Securities** being fraudulently misdirected from Downwind's account with Shift4 to the Scam Bank Account without Downwind's knowledge or consent, there was a **Funds Transfer Fraud** falling within the Funds Transfer Fraud Coverage of the Chubb Policy.

45.     Additionally, coverage also exists under the Forgery Coverage provision because, on or about July 23, 2019, the Hacker, sent one or more emails to Shift4 from the Executive Email Account, pretending to be Mr. Buie, that was electronically signed with Mr. Buie's actual name and with the intent through deception and fraud, to misdirect the deposit of credit card sales

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

proceeds at the restaurant into the Scam Bank Account. These acts are specifically covered by the Policy's definition of **Forgery**.

46.     Moreover, the Hacker attached to the aforesaid fraudulent and forged email a fraudulently altered **Financial Instrument** in the form of a void check made upon the Scam Bank Account and fraudulently altered on its face to identify Downwind as the account owner (when, in fact, Downwind did not own and has never owned a bank account at BBVA Compass Bank).

47.     Accordingly, there was direct loss sustained by Downwind resulting from **Forgery** and an alteration of a **Financial Instrument** committed by a **Third Party** falling within the Forgery Coverage of the Chubb Policy.

48.     Notwithstanding its contractual duties under the policy and the laws of South Carolina, on or about June 11, 2020, after months of deliberate dallying, Chubb deliberately, unreasonably, maliciously, and in bad faith denied coverage for the Claim, stating that coverage was not available under the Computer Fraud Coverage, the Funds Transfer Fraud Coverage, or the Forgery Coverage (the "First Denial Letter").

49.     On or about December 23, 2021, Chubb continued in bad faith and with deliberate and malicious intent and purpose to shirk its duty to Downwind by yet again denying coverage for the Claim, continuing to assert that coverage was not available under the Computer Fraud Coverage or the Forgery Coverage (the "Second Denial Letter").

50.     By denying coverage of this covered claim, Chubb breached its contractual obligations to Downwind.

51.     Further, Chubb's denial of coverage was done deliberately, maliciously, and in bad faith and/or without a reasonable basis. In addition to Chubb's egregious conduct being in clear breach of the terms of the policy, Chubb's conduct also breached the implied covenant of good

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

faith and fair dealing arising under the contract for insurance between Chubb and Downwind by operation of law.

**FIRST CAUSE OF ACTION**
(Breach of Contract)

52. Downwind repeats and realleges the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth verbatim herein.

53. The Chubb Policy constitutes a valid enforceable insurance contract between Chubb and Downwind.

54. Downwind, the named insured, paid all premiums, provided prompt notice of the Claim, and otherwise performed all obligations required of it under the Chubb Policy.

55. Under the terms of the Chubb Policy, Chubb must pay up to $250,000 for a loss to Downwind that comes within certain coverages provisions, including, without limitation, the Computer Fraud Coverage, Funds Transfer Fraud Coverage, and Forgery Coverage under the Chubb Policy.

56. As detailed above, the facts of the Claim reflect clearly that the Claim is a covered claim under one or more provisions of the Chubb Policy, including without limitation, the Computer Fraud, Funds Transfer Fraud, and Forgery Coverages

57. Chubb has refused to make any payment to Downwind in connection with its Claim for coverage for losses caused by the Fraud. By deliberately refusing to provide coverage for Downwind's Claim, Chubb has breached the terms of its policy.

58. Further, in denying coverage, Chubb has knowingly and intentionally acted in bad faith and/or in an unreasonable manner, and thus, Downwind is entitled to recover reasonable attorney's fees and costs pursuant to S.C. Code Ann. § 38-59-40, in addition to recovering its losses of money and property.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

59.     As a direct and proximate result of Chubb's breach of its policy, Downwind has suffered damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, costs and litigation expenses, and pre- and post-judgment interest to the maximum extent permitted by law.

**SECOND CAUSE OF ACTION**
(Bad Faith and/or Unreasonable Refusal to Pay Insurance Claim)

60.     Downwind repeats and realleges the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth verbatim herein.

61.     In addition to other duties, Chubb owed Downwind a duty of good faith and fair dealing and implicitly covenanted to act promptly to pay covered benefits, to act reasonably and in good faith, and to refrain from doing anything to impair or delay Downwind's rights to receive benefits under the Chubb Policy.

62.     Chubb breached its duty of good faith and fair dealing by deliberately, recklessly, maliciously, unreasonably, and/or in bad faith denying coverage under the terms of the policy, and particularly the Computer Fraud insuring provision on the contrived, unjust, and unreasonable basis that "[w]hile there may have been an unauthorized access to Mr. Buie's email account," the "loss" suffered by Downwind "did not directly result from a Computer Fraud and computer violation" because "those emails did not directly cause the loss." Instead, Chubb speciously and maliciously argues that "the loss resulted directly from [Shift4's] reliance o[n] fraudulent account information that [it] used to set up [Downwind's] deposits."

63.     Chubb knew at the time, and knows today, that its basis for denying coverage was unjust, contrived, and unreasonable. Indeed, it had made precisely the same losing argument a mere 3 years prior before the Southern District of New York in *Medidata Solutions, Inc. v. Federal Insurance Company*, 268 F. Supp. 3d 471 (S.D.N.Y. 2017), *aff'd*, 729 F. App'x 117 (2d Cir. 2018).

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

There, the District Court, finding coverage in favor of the insured under a similar computer fraud insuring provision, soundly rejected Chubb's position, reasoning that "[t]he chain of events [that led to the insured's loss] began with an accounts payable employee receiving a spoofed email from a person posing as [the insured's] president ... [The insured's] employees only initiated the transfer [of millions of dollars to a scam bank account] as a direct cause of the thief sending spoof emails posing as [the insured's] president." *Id.* at 479. This decision was later affirmed by the United States Court of Appeals for the Second Circuit.

64. Notwithstanding this clear precedent in a previous and similar case in which Chubb was a losing litigant, Chubb nevertheless recycled this same losing argument in its First Denial Letter as a basis for denying Computer Fraud Coverage to Downwind in this case. Downwind, however, through its counsel, reminded Chubb of the *Medidata* holding, placed Chubb on notice that its basis for denial was unreasonable and in bad faith, and demanded that Chubb provide the coverages that it promised in the Chubb Policy and provide payment of the loss in the amount of $139,724.65. Notwithstanding clear notice, Chubb still unreasonably and in bad faith refused to live up to its obligations under the Chubb Policy.

65. In fact, the Second Denial Letter, was prepared by the same law firm that litigated the *Medidata* case on behalf of Chubb. Doing the bidding of a client intent on unreasonably evading its lawful obligations, the law firm tellingly pivoted away from the losing causality argument in the First Denial Letter and instead, spent six pages of the eight-page Second Denial Letter concocting and manufacturing yet another unreasonable basis for denial. This time Chubb remarkably and unreasonably argues that "the claim is not covered because the funds at issue did not belong to Downwind."

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

66. In sum, in a continuing bad faith and unreasonable effort to evade its obligations, Chubb asserts that funds from credit card sales paid to Downwind by customers for the provision of food and beverage at Damon's Grill and fraudulently deposited into the Scam Bank Account did not really "belong" to Downwind, such that no covered loss actually occurred in this instance, whether under the Computer Fraud Coverage or any other insuring provision.

67. These bases for denial, however, are grossly unreasonable on their face and demonstrate the unreasonable, reckless, and malicious nature of Chubb's bad faith in this case. Indeed, Downwind has full right, title, and interest in and to the credit card sales proceeds lawfully earned by and paid to Downwind by customers for the provision of food and beverage at Damon's Grill but were deposited into the Scam Bank Account, as a direct and proximate result of the Fraud. Chubb's argument otherwise is divorced from reality, asserted in what can only be described as a vain, yet malicious, effort to give Chubb the veneer of a basis for denial after being confronted with its own *Medidata* case. Its conduct in trying to hide behind this malicious veneer is further evidence of Chubb's bad faith conduct and/or an unreasonable denial of coverage.

68. But of course Chubb knew about the *Medidata* case all along, and knew its denial of coverage to Downwind was in direct contravention of the *Medidata* case and, more important, was a direct and deliberate breach of its obligations to Downwind under the Chubb Policy and South Carolina law. Uncaring about its duties to Downwind and in a brazen display of moral corruption, Chubb has essentially said to Downwind, "we don't care about our promises and our duties; we are strong enough and powerful enough that we will force you to sue us to get what is rightfully yours; after all, it's only $139,724.65 and that's all you get even if you win because our denial has a reasonable basis upon which we stand; why – our lawyer says our conduct is reasonable even though these are the same lawyers who lost the *Medidata* case, and, besides they

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

say the *Medidata* case is inapplicable to the facts of Downwind's case, and, further, even if they and we are just plain wrong and *Medidata* is applicable to the facts of Downwind's claim, then by golly we will defend on the basis that the United States District Court for the Southern District of New York and the United States Court of Appeals for the Second Circuit got it wrong and we want the opportunity to persuade South Carolina courts that the outcome against Downwind should be different and in Chubb's favor." And Chubb takes this absurd position with full knowledge that in South Carolina policies are construed against the insurer and in favor of coverage. *See, e.g., M & M Corp. of S.C. v. Auto-Owners Ins. Co.*, 390 S.C. 255, 259, 701 S.E.2d 33, 35 (2010) ("Policies are construed in favor of coverage"); *see also Jefferson-Pilot Fire & Cas. Co. v. Sunbelt Beer Distributors, Inc.*, 839 F._Supp. 376, 378 (D.S.C. 1993) ("South Carolina law commands that insurance coverage is to be liberally construed against the insurer"). Chubb's brazen "in your face" attitude is exactly the reason an unreasonable failure to pay insurance proceeds cause of action exists and is appropriate here.

69. In summary, with full knowledge that Downwind's claim is valid and should be paid, Chubb has wrongfully and in breach of its policy with Downwind, in breach of South Carolina law, and in breach of the implied covenant of good faith and fair dealing denied coverage and refused to pay benefits due to Downwind under the Chubb Policy and has done so deliberately, maliciously and in bad faith and/or without reasonable basis.

70. As a direct and proximate result of Chubb's bad faith and/or unreasonable declination of coverage, Downwind has suffered injury and is entitled to actual, consequential, and punitive damages in an amount to be determined at trial by a jury, plus attorneys' fees, pre- and post-judgment interest to the maximum extent permitted by law, and for all costs including litigation expenses of having to initiate and maintain this action.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

**THIRD CAUSE OF ACTION**
(Declaratory Relief)

71. Downwind repeats and realleges the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth verbatim herein.

72. Under the terms of the Chubb Policy, Chubb promised to pay up to $250,000 for a loss to Downwind that comes within certain coverages under the policy, including, without limitation, the Computer Fraud Coverage, Funds Transfer Fraud Coverage, and/or Forgery Coverage under the Chubb Policy.

73. As detailed above, the facts of Downwind's Claim fall within the coverages of the Chubb Policy, including, without limitation, the Computer Fraud Coverage, Funds Transfer Fraud, and Forgery Coverage provisions.

74. However, Chubb has unreasonably denied coverage and refused to pay Downwind's Claim.

75. Pursuant to the South Carolina Declaratory Judgment Act, and particularly S.C. Code Ann. § 15-53-30 thereof, Downwind is entitled to a declaration by this Court finding and ruling that the Chubb Policy covers Downwind's Claim and that Chubb must pay same forthwith, along with pre-judgment interest and any other damages that Downwind has suffered.

76. An actionable and justiciable controversy exists between Downwind and Chubb.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A. For insurance coverage and actual damages in the amount of $139,724.65 and such other actual damages as may be discovered and proved at trial;

B. For all other actual damages;

C. For consequential damages;

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

D. For punitive damages in an amount to be determined by the jury;

E. For pre- and post-judgement interest at the maximum rate permitted by law;

F. For its attorneys' fees;

G. For all litigation expenses and costs of this action;

H. For a declaratory judgment in favor of Downwind and against Chubb, declaring Chubb is obligated to pay Downwind for its losses; and

I. For such other and further relief as the Court deems just, equitable, and proper.

Respectfully submitted,

s/ Andrew J. D'Antoni

Mitchell Willoughby (S.C. Bar No. 6161)
Andrew J. D'Antoni (S.C. Bar No. 100919)
**WILLOUGHBY & HOEFER, P.A.**
P.O. Box 8416
Columbia, SC 29202
(803) 252-3300
mwilloughbyhoefer@willoughbyhoefer.com
adantoni@willoughbyhoefer.com

*Attorneys for Plaintiff Downwind Trading Company, Inc., d/b/a Damon's Grill*

February 15, 2022
Columbia, South Carolina

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

# EXHIBIT A

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

CHUBB

January 16, 2019

Janet Warlick
MCGRIFF INSURANCE SERVICES INC
1359 21ST AVE. N, #105
MYRTLE BEACH, SC 29578-0000

RE: Downwind Trading Co, Inc DBA Damons Grill of Myrtle Beach

Insuring Company: Federal Insurance Company

Dear Janet:

Enclosed is our ForeFront Portfolio 3.0 Policy for the above referenced Insured.

I want to thank you for the opportunity to underwrite this account.

Please let me know if I can be of further assistance.

Sincerely,

Confidential
Date Received

JAN 23 2019

Division 113-Myrtle Beach, SC 29577

Thomas E Till

CHUBB

ap

Chubb Group Of Insurance Companies
82 Hopmeadow Street
P.O. Box 2002
Simsbury, CT 06070-7683
860.408.2000
Fax 860.408.2002

ELECTRONICALLY FILED - 2022 Feb 15 3:28 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

PREMIUM BILL

Date: 01/16/2019

Insured: Downwind Trading Co, Inc DBA Damons Grill of Myrtle Beach

Producer: MCGRIFF INSURANCE SERVICES INC
1359 21ST AVE. N, #105
MYRTLE BEACH, SC 29578-0000

Company: Federal Insurance Company

THIS BILLING IS TO BE ATTACHED TO AND FORM A PART OF THE POLICY REFERENCED BELOW.

Policy Number: 8242-5843

Policy Period: April 1, 2019 to April 1, 2020

NOTE: PLEASE RETURN THIS BILL WITH REMITTANCE AND NOTE HEREON ANY CHANGES. BILL WILL BE RECEIPTED AND RETURNED TO YOU PROMPTLY UPON REQUEST.

| Product | Effective Date | Commission Rate | Premium |
|---|---|---|---|
| FFP30 | 04/01/19 | 15.00 % | $1,414.00 |
| | | | |
| | | | |

* For Kentucky policies, amount displayed includes tax and collection fees.

| | |
|---|---|
| **TOTAL POLICY PREMIUM** | $1,414.00 |
| **TOTAL INSTALLMENT PREMIUM DUE** | $1,414.00 |

WHEN REMITTING PLEASE INDICATE POLICY OR CERTIFICATE NUMBER

Confidential
Date Received

JAN 23 2019

Division 113-Myrtle Beach, SC 29577

Form 26-10-0426 (Ed. 2/98)

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

# POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

**(for policies with no terrorism exclusion or sublimit)**
**Insuring Company: Federal Insurance Company**

You are hereby notified that, under the Terrorism Risk Insurance Act (the "Act"), this policy makes available to you insurance for losses arising out of certain acts of terrorism. Terrorism is defined as any act certified by the Secretary of the Treasury of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that the insurance provided by your policy for losses caused by acts of terrorism is partially reimbursed by the United States under the formula set forth in the Act. Under this formula, the United States pays 85% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage. Beginning in 2016, the Federal share will be reduced by 1% per year until it reaches 80%, where it will remain.

However, if aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

If aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

The portion of your policy's annual premium that is attributable to insurance for such acts of terrorism is: $ **-0-**.

If you have any questions about this notice, please contact your agent or broker.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

# IMPORTANT NOTICE TO POLICYHOLDERS

Insuring Company: Federal Insurance Company

All of the members of the Chubb Group of Insurance companies doing business in the United States (hereinafter "Chubb") distribute their products through licensed insurance brokers and agents ("producers"). Detailed information regarding the types of compensation paid by Chubb to producers on US insurance transactions is available under the Producer Compensation link located at the bottom of the page at www.chubb.com, or by calling 1-866-588-9478. Additional information may be available from your producer.

Thank you for choosing Chubb.

ELECTRONICALLY FILED - 2022 Feb 15 5:28 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

# Notice of Loss Control Services

Insuring Company: Federal Insurance Company

As a Chubb policyholder, you have loss prevention information and/or services available to you, as listed in this Notice. You may order any brochure by email to formsordering@chubb.com and to view our full suite of loss prevention brochures/services go to www.chubb.com/us/fl-lossprevention

## Directors and Officers (D&O) Liability Loss Prevention Services

- ***Directors and Officers Liability Loss Prevention* Manuals:**
  Directors and Officers Liability Loss Preventions – #14-01-0035
  Directors and Officers Securities Litigation Loss Preventions – #14-01-0448
  Director Liability Loss Prevention in Mergers and Acquisitions – #14-01-1099
  Directors and Officers Liability Loss Prevention for Not-for-Profit- -#14-01-0036
  Cyber Loss Mitigation for Directors -#14-01-1199

## Employment Practices Liability (EPL) Loss Prevention Services

- **Toll-free Hot Line**

  Have a question on how to handle an employment situation? Simply call **1.888.249.8425** to access the nationally known employment law firm of Jackson Lewis P.C. We offer customers an unlimited number of calls to the hot line at no additional charge.

- **ChubbWorks.com**
  ChubbWorks.com is a web-based platform that offers multiple services including overviews of employment laws, sample employment policies and procedures, and on-line training. To gain immediate access to ChubbWorks go to **www.chubbworks.com** and register using your policy number.

- ***Employment Practices Loss Prevention Guidelines* Manual**

  *Employment Practices Loss Prevention Guidelines - #14-01-0061*

- **Loss Prevention Consultant Services**

  Chubb has developed a network of more than 120 law firms, human resources consulting firms, and labor economist/statistical firms that offer specialized services for employment issues.

- **Public Company EPL Customers**

  Employment Practices Loss Prevention Guidelines – Written by Seyfarth Shaw exclusively for Chubb this manual provides an overview of key employment issues faced by for-profit companies and offers proactive idea for avoiding employment lawsuits.

- **Private Company EPL Customers**
  Employment Practices Loss Prevention Guidelines – Written by Seyfarth Shaw exclusively for Chubb this manual provides an overview of key employment issues for –profit companies and offers proactive idea for avoiding employment lawsuits.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

## Fiduciary Liability Loss Prevention Services

- **Fiduciary Liability Loss Prevention Manual**
  Who May Sue You and Why: How to Reduce Your ERISA Risks and the Role of Fiduciary Liability Insurance #14-01-1019

## Crime Loss Prevention Services

- **Crime/Kidnap, Ransom & Extortion Loss Prevention Manual**

  Preventing Fraud: How Anonymous Hotlines Can Help #14-01-1090

## Cyber Security Loss Prevention Services

Visit: https://www2.chubb.com/us-en/business-insurance/cyber-security.aspx to learn more about Chubb's Cyber Services for our policyholders.

## Health Care Directors and Officers (D&O) Liability Loss Prevention Services

- **Readings in Health Care Governance Manual**
  Readings in Health Care Governance -#14-01-0788
- **ChubbWorks.com**
  ChubbWorks.com for Health Care Organizations – The Health Care Zone is a free online resource containing health care specific loss prevention information for employment practices liability, directors and officers (D&O) liability, and fiduciary liability exposures. To gain immediate access to ChubbWorks go to **www.chubbworks.com** and register using your policy number.
- **Health Care D&O Loss Prevention Consultant Services**
  Health Care D& O Loss Prevention Consultant Services- #14-01-1164

---

The services provided are advisory in nature. While this program is offered as a resource in developing or maintaining a loss prevention program, you should consult competent legal counsel to design and implement your own program. No liability is assumed by reason of the services, access or information provided. All services are subject to change without notice.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

CHUBB® Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0SM**
**General Terms and Conditions**

**GTC DECLARATIONS**

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under the laws of Indiana, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN. 46204-1927

**Policy Number:** 8242-5843

**NOTICE: THE LIABILITY COVERAGE PARTS PROVIDE CLAIMS-MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD", OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY "DEFENSE COSTS", AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE RETENTION. IN NO EVENT WILL THE COMPANY BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY. READ THE ENTIRE POLICY CAREFULLY.**

**Item 1.** **Parent Organization:** Downwind Trading Co, Inc DBA Damons Grill of Myrtle Beach

Principal Address: 1300 PROFESSIONAL DRIVE
MYRTLE BEACH, SC 29577

**Item 2.** **Policy Period:**

(A) From: April 1, 2019

(B) To: April 1, 2020

At 12:01 AM local time at the address shown in Item 1.

**Item 3.** **A Combined Maximum Aggregate Limit of Liability applies:**

[ ] Yes [X] No

The Combined Maximum Aggregate Limit of Liability for all **Claims** under all **Liability Coverage Parts** shall be:

Not Applicable

**Item 4.** **Coverage applicable to this Policy:**

[ ] Directors & Officers and Entity Liability Coverage Part

[ ] Employment Practices Liability Coverage Part

[ ] Fiduciary Liability Coverage Part

[ ] Miscellaneous Professional Liability Coverage Part

[ ] Employed Lawyers Liability Coverage Part

4:22-cv-00889-JD Date Filed 03/17/22 Entry Number 1-1 Page 35 of 73

CHUBB Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**SM
**General Terms and Conditions**

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

- [ ] CyberSecurity Coverage Part
- [X] Crime Coverage Part
- [ ] Kidnap Ransom and Extortion Coverage Part
- [ ] Workplace Violence Expense Coverage Part

**Item 5. Extended Reporting Period:**

(A) Additional Period: Not Applicable

(B) Additional Premium: Not Applicable % of Annual Premium

In witness whereof, the Company issuing this Policy has caused this Policy to be signed by its authorized officers but it shall not be valid unless also signed by a duly authorized representative of the Company.

**FEDERAL INSURANCE COMPANY**

Secretary

President

01/16/2019

Date

Authorized Representative

14-02-17270D (11/2010) 2 of 2

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

**In consideration of payment of the premium and subject to the Declarations and the limitations, conditions, provisions and other terms of this Policy, the Company and the Insureds agree as follows:**

## I. TERMS AND CONDITIONS

Except for these General Terms and Conditions or unless stated to the contrary in any Coverage Part, the terms and conditions of each Coverage Part apply only to that Coverage Part. If any provision in these General Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part. All references to "Section", "Subsection", "Paragraph" or "Subparagraph" in these General Terms and Conditions shall apply only to these General Terms and Conditions, unless otherwise stated. All references to "Section", "Subsection", "Paragraph" or "Subparagraph" in a Coverage Part, shall apply only to such Coverage Part, unless otherwise stated.

## II. DEFINITIONS

**Anniversary Date** means the date and time exactly one (1) year after the date and time set forth in Item 2(A), Policy Period, of the GTC Declarations and each succeeding date and time exactly one (1) year after the previous **Anniversary Date.**

**Claim** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Coverage Event** means the event or loss which must occur or be sustained or discovered, in order to invoke coverage under each **Non-Liability Coverage Part.**

**Defense Costs** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Expense** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Insured** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Insured Person** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Liability Coverage Part** means:

(A) the Directors & Officers and Entity Liability, Employment Practices Liability, Fiduciary Liability, Employed Lawyers Liability and Miscellaneous Professional Liability Coverage Parts; and

(B) Insuring Clause (A), Cyber Liability Coverage, of the CyberSecurity Coverage Part,

if purchased as set forth in Item 4, Coverage applicable to this Policy, of the GTC Declarations.

**Loss** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Non-Liability Coverage Part** means:

(A) the Crime, Kidnap Ransom and Extortion and Workplace Violence Expense Coverage Parts; and

(B) Insuring Clauses (B), Privacy Notification and Crisis Management Expenses Coverage; (C), Reward Expenses Coverage; (D), E-Business Interruption and Extra Expenses Coverage; (E), E-Threat Expenses Coverage and (F), E-Vandalism Expenses Coverage, of the CyberSecurity Coverage Part,

if purchased as set forth in Item 4, Coverage applicable to this Policy, of the GTC Declarations.

**Organization** means the **Parent Organization** and any **Subsidiary. Organization** shall also mean any such entity as a debtor in possession under United States bankruptcy law or the equivalent of a debtor in possession under the law of any other country.

**Parent Organization** means the entity named in Item 1 of the GTC Declarations.

4:22-cv-00889-JD Date Filed 03/17/22 Entry Number 1-1 Page 37 of 73

CHUBB® Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0SM**
**General Terms and Conditions**

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

**Policy Period** means the period of time set forth in Item 2 of the GTC Declarations, subject to any prior termination in accordance with Section X, Termination of Policy.

**Policy Year** means the period, within the **Policy Period**, from the date and time set forth in Item 2(A), Policy Period, of the GTC Declarations to the first **Anniversary Date**, or the period from an **Anniversary Date** to its next succeeding **Anniversary Date**, subject to any prior termination in accordance with Section X, Termination of Policy.

**Potential Claim** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Related Claims** means all **Claims** for **Wrongful Acts** based upon, arising from, or in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

**Securityholder Derivative Demand Evaluation Costs** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Subsidiary** means:

(A) any entity while more than fifty percent (50%) of the outstanding securities representing the present right to vote for election of or to appoint directors, trustees, managers, members of the Board of Managers or equivalent positions of such entity are owned, or controlled, by the **Parent Organization**, directly or through one or more **Subsidiaries**;

(B) any entity while:

(1) exactly fifty percent (50%) of the voting rights representing the present right to vote for election of or to appoint directors, trustees, managers, members of the Board of Managers or equivalent positions of such entity are owned, or controlled, by the **Parent Organization**, directly or through one or more **Subsidiaries**; and

(2) the **Parent Organization**, pursuant to a written contract with the owners of the remaining and outstanding voting stock of such entity, solely controls the management and operation of such entity; or

(C) any foundation, charitable trust or political action committee while such entity is controlled by the **Parent Organization**.

**Voluntary Program Loss** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Voluntary Program Notice** shall have the meaning ascribed to that term in each applicable Coverage Part.

**Wrongful Act** shall have the meaning ascribed to that term in each applicable Coverage Part.

## III. LIMIT OF LIABILITY

(A) With respect to the **Liability Coverage Parts**:

(1) If the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations is elected, the amount stated in such Item 3 shall be the maximum aggregate limit of liability of the Company for all **Loss**, **Voluntary Program Loss** and **Securityholder Derivative Demand Evaluation Costs** during each **Policy Year** under all **Liability Coverage Parts** combined. However, any **Loss**, **Voluntary Program Loss** or **Securityholder Derivative Demand Evaluation Costs** paid under any **Liability Coverage Part** shall not exceed the Maximum Aggregate Limit of Liability set forth in Item 2 of the Declarations of such Coverage Part.

(2) If the Combined Maximum Aggregate Limit of Liability set forth in Item 3 of the GTC Declarations is not elected, the maximum aggregate limit of liability of the Company for all **Loss**, **Voluntary Program Loss**, and **Securityholder Derivative Demand Evaluation Costs** during each **Policy Year** under each **Liability Coverage Part** shall be the Maximum Aggregate Limit of Liability set forth in Item 2 of the Declarations for each **Liability Coverage Part**.

14-02-17270 (12/2010) Page 2 of 7

4:22-cv-00889-JD Date Filed 03/17/22 Entry Number 1-1 Page 38 of 73

CHUBB Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

ForeFront Portfolio 3.0SM
General Terms and Conditions

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

(3) **Defense Costs** are part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2 of the Declarations of each **Liability Coverage Part** and payment by the Company of **Defense Costs** shall reduce and may exhaust such Limits of Liability.

(B) With respect to the **Non-Liability Coverage Parts**, the Company's maximum liability shall be the Limits of Liability set forth in the Declarations of each **Non-Liability Coverage Part**.

## IV. RELATED CLAIMS

With respect to the **Liability Coverage Parts**:

(A) All **Related Claims** shall be deemed a single **Claim** made in the **Policy Year** in which the earliest of such **Related Claims** was first made or first deemed to have been made in accordance with the Reporting section of the applicable **Liability Coverage Part** (the "Earliest Related Claim").

(B) All **Related Claims** shall be subject to the same Retention and Limits of Liability applicable to the Earliest Related Claim.

## V. EXTENDED REPORTING PERIOD

With respect to the **Liability Coverage Parts**:

(A) If this Policy does not renew or otherwise terminates for a reason other than for failure to pay premium (each a "Termination of Coverage"), then an **Insured** shall have the right to purchase an Extended Reporting Period for the Additional Period and Additional Premium set forth in Item 5 of the GTC Declarations.

(B) In the event of a Termination of Coverage and upon request from an **Insured**, the Company shall, in its sole discretion, provide a quote for Additional Periods other than as set forth in Item 5, Extended Reporting Period, of the GTC Declarations. Any such additional quote offered shall be subject to such Additional Premium as the Company may require.

(C) The offer of renewal terms and conditions or premiums different from those in effect prior to renewal shall not constitute refusal to renew.

(D) This right to purchase an Extended Reporting Period shall lapse unless written notice of election to purchase the Extended Reporting Period, together with payment of the applicable Additional Premium, is received by the Company within sixty (60) days after the effective date of the Termination of Coverage.

(E) If an Extended Reporting Period is purchased, then coverage otherwise afforded by this Policy shall be extended to apply to **Claims**: (1) first made during such Extended Reporting Period; and (2) reported to the Company pursuant to the Reporting section of the applicable Coverage Part, but only to the extent such **Claims** are for **Wrongful Acts** before the effective date of such Termination of Coverage or the date of any conversion of coverage described in Section VI, Changes in Exposure, whichever is earlier. Any **Claim** made during the Extended Reporting Period shall be deemed to have been made during the **Policy Year** immediately preceding the Extended Reporting Period.

(F) The entire premium for the Extended Reporting Period shall be deemed fully earned at the inception of such Extended Reporting Period.

(G) The limit of liability for the Extended Reporting Period is part of and not in addition to any maximum aggregate limit of liability for the **Policy Year** immediately preceding the Extended Reporting Period.

14-02-17270 (12/2010) Page 3 of 7

4:22-cv-00889-JD Date Filed 03/17/22 Entry Number 1-1 Page 39 of 73

CHUBB® Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**SM
**General Terms and Conditions**

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

VI. **CHANGES IN EXPOSURE**

(A) **Acquisition of Another Organization**

(1) If before or during the **Policy Period** an **Organization** acquires voting rights in another entity such that the acquired entity becomes a **Subsidiary**,

(2) then coverage shall be provided for such **Subsidiary** and its **Insureds** with respect to any:

(a) **Liability Coverage Part**, solely for **Claims** for **Wrongful Acts** after such acquisition; or

(b) **Non-Liability Coverage Part**, solely after the effective date of such acquisition subject to the Liability for Prior Losses section of such **Non-Liability Coverage Part**.

(B) **Cessation of Subsidiaries**

(1) If before or during the **Policy Period** an **Organization** ceases to be a **Subsidiary**,

(2) then with respect to any:

(a) **Liability Coverage Part**, coverage for such **Subsidiary** and its **Insureds** shall continue until termination of this Policy in accordance with Section VI(C), Conversion of Coverage Under Certain Circumstances, or Section X, Termination of Policy, whichever occurs first, but only for **Claims** for **Wrongful Acts** while such **Organization** was a **Subsidiary**; or

(b) **Non-Liability Coverage Part**, such **Subsidiary** and its **Insureds** shall cease to be **Insureds** as of the effective date of such cessation and coverage under this Policy shall apply as provided in such **Non-Liability Coverage Part**.

(C) **Conversion of Coverage Under Certain Circumstances**

(1) If during the **Policy Period** any of the following events occur:

(a) another entity, person or group of entities or persons acting in concert, acquires more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of directors, trustees, members of the Board of Managers or management committee members of the **Parent Organization**;

(b) the acquisition of all or substantially all of the **Parent Organization's** assets, by another entity, person or group of entities or persons acting in concert, or the merger of the **Parent Organization** into or with another entity such that the **Parent Organization** is not the surviving entity; or

(c) the **Parent Organization** emerges from bankruptcy as of the effective date stated in the plan of reorganization,

(2) then:

(a) any applicable coverage under this Policy with respect to:

(i) any **Liability Coverage Part**, shall continue until the expiration of the current **Policy Period**, solely for **Claims** for **Wrongful Acts** prior to such event;

(ii) the Crime Coverage Part, shall terminate subject to Exclusions III(C), Loss Sustained Option, or III(D), Loss Discovered Option, of such Coverage Part;

(iii) the Kidnap Ransom and Extortion Coverage Part, shall terminate subject to Exclusion III(A)(9), Notice, of such Coverage Part;

(iv) the Workplace Violence Coverage Part, shall terminate subject to Exclusion III(E) Notice, of such Coverage Part; or

(v) Insuring Clauses (B), Privacy Notification and Crisis Management Expenses Coverage; (C), Reward Expenses Coverage; (D), E-Business Interruption and

14-02-17270 (12/2010) Page 4 of 7

4:22-cv-00889-JD Date Filed 03/17/22 Entry Number 1-1 Page 40 of 73

CHUBB Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

*ForeFront Portfolio 3.0*SM
*General Terms and Conditions*

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

Extra Expenses Coverage; (E), E-Threat Expenses Coverage and (F), E-Vandalism Expenses Coverage, of the CyberSecurity Coverage Part, shall continue until the expiration of the current **Policy Period** solely for **Expense** first incurred prior to such event;

(b) the **Parent Organization** shall give written notice of such event to the Company as soon as practicable together with such information as the Company may require; and

(c) the entire premium for this Policy shall be deemed fully earned as of the effective date of such event.

## VII. SPOUSES, DOMESTIC PARTNERS, ESTATES AND LEGAL REPRESENTATIVES

With respect to the **Liability Coverage Parts**, coverage under this Policy shall extend to **Claims** for **Wrongful Acts** of an **Insured Person** made against:

(A) the lawful spouse or domestic partner of such **Insured Person** solely by reason of such spouse or domestic partner's status as a spouse or domestic partner, or such spouse or domestic partner's ownership interest in property which the claimant seeks as recovery for an alleged **Wrongful Act** of such **Insured Person**; or

(B) the estate, heirs, legal representatives or assigns of such **Insured Person** if such **Insured Person** is deceased, or the legal representatives or assigns of such **Insured Person** if such **Insured Person** is legally incompetent, insolvent or bankrupt,

provided that no coverage afforded by this Section VII shall apply with respect to any loss arising from an act, error or omission by an **Insured Person's** spouse, domestic partner, estate, heirs, legal representatives or assigns.

## VIII. SUBROGATION

In the event of any payment under this Policy, the Company shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery. As a condition precedent to the Company's payment under this Policy, the **Insureds** agree to execute all papers required and shall take all reasonable actions to secure and preserve such rights, including the execution of such documents necessary to enable the Company to effectively bring suit or otherwise pursue subrogation rights in the name of the **Insureds**.

## IX. NOTICE

(A) Notice to the Company of any **Claim**, **Potential Claim**, **Voluntary Program Notice** or circumstances under any **Liability Coverage Part**, or any **Coverage Event** under any **Non-Liability Coverage Part**, shall be deemed notice under the Policy in its entirety.

(B) All notices to the Company under this Policy of any **Claim**, **Potential Claim**, **Voluntary Program Notice** or circumstances under any **Liability Coverage Part**, or any **Coverage Event** under any **Non-Liability Coverage Part**, shall be given in writing to one of the following addresses:

(1) specialtyclaims@chubb.com; or

(2) Attn: Claims Department
Chubb Group of Insurance Companies
82 Hopmeadow St.
Simsbury, CT 06070-7683

14-02-17270 (12/2010) Page 5 of 7

4:22-cv-00889-JD Date Filed 03/17/22 Entry Number 1-1 Page 41 of 73

CHUBB Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0**SM
**General Terms and Conditions**

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

(C) All other notices to the Company under this Policy shall be given in writing addressed to:

Attn: Chubb Underwriting Department
Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

(D) Any notice described above shall be effective on the date of receipt by the Company.

## X. TERMINATION OF POLICY

(A) This Policy shall terminate at the earliest of the following times:

(1) upon receipt by the Company of written notice of termination from the **Parent Organization**, provided that this Policy may not be terminated by the **Parent Organization** after the effective date of any event described in Section VI(C), Conversion of Coverage Under Certain Circumstances;

(2) upon expiration of the **Policy Period** set forth in Item 2 of the GTC Declarations;

(3) twenty (20) days after receipt by the **Parent Organization** of a written notice of termination from the Company based upon nonpayment of premium, unless the premium is paid within such twenty (20) day period; or

(4) at such other time as may be agreed upon by the Company and the **Parent Organization**.

(B) The Company shall refund the unearned premium computed at customary short rates if this Policy is terminated by the **Parent Organization**. Under any other circumstances the refund shall be computed pro rata. Payment or tender of any unearned premium by the Company shall not be a condition precedent to the effectiveness of such termination, but such payment shall be made as soon as practicable.

## XI. BANKRUPTCY

Bankruptcy or insolvency of an **Insured** shall not relieve the Company of its obligations nor deprive the Company of its rights or defenses under this Policy.

## XII. COORDINATION OF COVERAGE

Any **Loss** covered under more than one **Liability Coverage Part** shall be first covered under the CyberSecurity Coverage Part, if applicable, subject to its terms, conditions and limitations. Any remaining portion of such **Loss** which is not paid under the CyberSecurity Coverage Part shall then be covered under the Employment Practices Coverage Part, if applicable, subject to its terms, conditions and limitations. Any remaining portion of such **Loss** otherwise covered under any other applicable **Liability Coverage Part** which is not paid under the CyberSecurity or Employment Practices Liability Coverage Parts shall be covered under such other **Liability Coverage Part**, subject to the terms, conditions and limitations of such **Liability Coverage Part**.

Any loss covered under the CyberSecurity Coverage Part and the Kidnap Ransom and Extortion Coverage Part shall be first covered under the Kidnap Ransom and Extortion Coverage Part, subject to its terms, conditions and limitations. Any remaining portion of such loss otherwise covered under the CyberSecurity Coverage Part which is not paid under the Kidnap Ransom and Extortion Coverage Part shall be covered under the CyberSecurity Coverage Part, subject to its terms, conditions and limitations.

14-02-17270 (12/2010) Page 6 of 7

4:22-cv-00889-JD Date Filed 03/17/22 Entry Number 1-1 Page 42 of 73

CHUBB® Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0SM**
**General Terms and Conditions**

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

## XIII. VALUATION AND FOREIGN CURRENCY

All premiums, limits, retentions, loss and other amounts under this Policy are expressed and payable in the currency of the United States of America. Except as otherwise provided in this Policy, if a judgment is rendered, a settlement is denominated or any element of loss under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States of America dollars at the rate of exchange published in *The Wall Street Journal* on the date the judgment becomes final, the amount of the settlement is agreed upon or any element of loss is due, respectively.

## XIV. ACTION AGAINST THE COMPANY

No action may be taken against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy. No person or entity shall have any right under this Policy to join the Company as a party to any action against any **Insured** to determine such **Insured's** liability nor shall the Company be impleaded by such **Insured** or legal representatives of such **Insured**.

## XV. ROLE OF PARENT ORGANIZATION

By acceptance of this Policy, the **Parent Organization** agrees that it shall be considered the sole agent of, and shall act on behalf of, each **Insured** with respect to: (A) the payment of premiums and the receiving of any return premiums that may become due under this policy; (B) the negotiation, agreement to and acceptance of endorsements; and (C) the giving or receiving of any notice provided for in this Policy (except the giving of notice to apply for an Extended Reporting Period as provided in Section V, Extended Reporting Period, the giving of notice as provided in Section VIII, Proof of Loss and Legal Proceedings, of the CyberSecurity Coverage Part and the giving of notice of **Claim, Potential Claim, Voluntary Program Notice** or circumstances as provided in the Reporting section of the applicable **Liability Coverage Part**). Each **Insured** agrees that the **Parent Organization** shall act on its behalf with respect to all such matters.

## XVI. ALTERATION AND ASSIGNMENT

No change in, modification of, or assignment of interest under this Policy shall be effective except when made by written endorsement to this Policy which is signed by an authorized representative of Chubb, a division of Federal Insurance Company.

## XVII. TERRITORY

This Policy shall apply anywhere in the world.

## XVIII. HEADINGS

The descriptions in the headings and subheadings of this Policy are solely for convenience and form no part of the terms and conditions of coverage.

## XIX. COMPLIANCE WITH TRADE SANCTIONS

This insurance does not apply to the extent that trade or economic sanctions or other similar laws or regulations prohibit the Company from providing insurance.

14-02-17270 (12/2010) Page 7 of 7

ELECTRONICALLY FILED - 2022 Feb 15 3:26 PM - HORRY - COMMON PLEAS - CASE#2022CP26009??

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

# Schedule of Forms

To be attached to and form part of Policy No. 8242-5843

Company: Federal Insurance Company

Issued to: Downwind Trading Co, Inc DBA Damons Grill of Myrtle Beach

ForeFront Portfolio 3.0 General Terms and Conditions Policy

14-02-17837 (4/11 ed.)

14-02-22814 (12/17 ed.)

ForeFront Portfolio 3.0 Crime Coverage Part Federal

14-02-12458 F3 (5/11 ed.)

14-02-18107 (5/11 ed.)

14-02-19628 (8/14 ed.)

FL-261169 (7/18 ed.)

ELECTRONICALLY FILED - 2022 Feb 15 3:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

**ENDORSEMENT**

Coverage Section: ForeFront Portfolio 3.0 General Terms and Conditions Policy

Effective date of
this endorsement: April 1, 2019

Federal Insurance Company

Endorsement No. 1

To be attached to and
form a part of Policy No. 8242-5843

Issued to: Downwind Trading Co, Inc DBA Damons Grill of Myrtle Beach

---

**SOUTH CAROLINA AMENDATORY ENDORSEMENT
TO THE GENERAL TERMS AND CONDITIONS**

In consideration of the premium charged, it is agreed that:

1. Subparagraph (A)(2) of Section X, Termination of Policy, is amended to add the following at the end of such Subparagraph (A)(2)

   ; provided that if the Company does not renew this policy, it will mail or deliver written notice of non-renewal, stating the precise reason(s) therefor, to the **Parent Organization** and to the agent of record, if any, at the address shown on this Policy, no less than sixty (60) days prior to the expiration date of the policy for any nonrenewal that would be effective between November first and May thirty-first and not less than ninety (90) days for any nonrenewal that would be effective between June first and October thirty-first.

2. Section X, Termination of Policy, is further amended by adding the following to the end of Section X, Termination of Policy:

   Any notice of termination or non-renewal by the Company shall be mailed or delivered to the **Parent Organization** at the address shown on this Policy, with a copy to the agent or broker of record, if any, and shall state the precise reason(s) therefor.

   The Company may condition renewal of this Policy upon changed terms, by mailing or delivering to the **Parent Organization** at least sixty (60) days' advance written notice of the amount of any renewal premium and the nature of any other proposed renewal changes. If the Company fails to provide notice in connection with any conditional renewal, the **Parent Organization** may cancel the renewal policy within thirty (30) days following its receipt of the renewal terms, in which case the earned premium for coverage during any such period of coverage after the end of the **Policy Period** will be computed on a pro-rata basis based on the premium applicable to this Policy.

   Proof of mailing of any notice set forth in this Section shall be sufficient proof of notice.

The Policy will be deemed to have been amended to the extent necessary to effect the purposes and intent of this Amendatory Endorsement.

The regulatory requirements set forth in this Amendatory Endorsement shall supercede and take precedence over any provisions of the Policy or any endorsement to the Policy, whenever added, that are inconsistent with or contrary to the provisions of this Amendatory Endorsement, unless such Policy or endorsement provisions comply with the applicable insurance laws of the State of South Carolina.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

**ENDORSEMENT/RIDER**

Coverage Section: ForeFront Portfolio 3 0 General Terms and Conditions Policy

Effective date of
this endorsement/rider: April 1, 2019

Federal Insurance Company

Endorsement/Rider No. 2

To be attached to and
form a part of Policy No. 8242-5843

Issued to: Downwind Trading Co, Inc DBA Damons Grill of Myrtle Beach

---

CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

In consideration of the premium charged, it is agreed that:

A. If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

   "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

   2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

B. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any "loss" that is otherwise excluded under this Policy.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

CHUBB® Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0[SM]**
**Crime Coverage Part**

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

**CRIME DECLARATIONS**

**FEDERAL INSURANCE COMPANY**
A stock insurance company, incorporated under the laws of Indiana, herein called the Company

Capital Center, 251 North Illinois, Suite 1100
Indianapolis, IN 46204-1927

**Item 1. Parent Organization:** Downwind Trading Co, Inc DBA Damons Grill of Myrtle Beach

**Item 2. Limits of Liability and Retentions:**

| Insuring Clauses Applicable to this Coverage Part: | Limits of Liability: | Retentions: |
|---|---|---|
| X (A) Employee Theft Coverage: | $250,000.00 | $2,500.00 |
| X (B) Premises Coverage: | $100,000.00 | $1,000.00 |
| X (C) In Transit Coverage: | $100,000.00 | $1,000.00 |
| X (D) Forgery Coverage: | $250,000.00 | $2,500.00 |
| X (E) Computer Fraud Coverage: | $250,000.00 | $2,500.00 |
| X (F) Funds Transfer Fraud Coverage: | $250,000.00 | $2,500.00 |
| X (G) Money Order and Counterfeit Currency Fraud Coverage: | $250,000.00 | $2,500.00 |
| X (H) Credit Card Fraud Coverage: | $250,000.00 | $2,500.00 |
| X (I) Client Coverage | $250,000.00 | $2,500.00 |
| X (J) Expense Coverage: | $50,000.00 | None |

**Item 3. Coverage applies as follows:** Loss Discovered

ELECTRONICALLY FILED - 2022 Feb 15 3:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

CHUBB Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

**ForeFront Portfolio 3.0SM**
**Crime Coverage Part**

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

**In consideration of payment of the premium and subject to the Declarations, General Terms and Conditions, and the limitations, conditions, provisions and other terms of this Coverage Part, the Company and the Insureds agree as follows:**

## I. INSURING CLAUSES

**Insuring Clause (A): Employee Theft Coverage**

(A) The Company shall pay the **Parent Organization** for direct loss of **Money**, **Securities** or **Property** sustained by an **Insured** resulting from **Theft** or **Forgery** committed by an **Employee** acting alone or in collusion with others.

**Insuring Clause (B): Premises Coverage**

(B) The Company shall pay the **Parent Organization** for direct loss sustained by an **Insured** resulting from:

(1) **Robbery**, **Safe Burglary**, or unlawful taking of **Money** or **Securities** committed by a **Third Party**; or

(2) actual destruction or disappearance of **Money** or **Securities**,

within or from the **Premises** or **Banking Premises**.

Coverage under this Insuring Clause (B) shall also include:

(3) loss of or damage to **Property** which results from **Robbery** or attempted **Robbery** within the **Premises**;

(4) loss of or damage to such **Property** contained within any locked vault or safe which results from **Safe Burglary** or attempted **Safe Burglary** within the **Premises**;

(5) damage to a locked safe, cash drawer, cash box or cash register within the **Premises** by felonious entry or attempted felonious entry or loss by felonious abstraction of such container from within the **Premises**; and

(6) damage to the **Premises** or to its exterior resulting from **Safe Burglary** or **Robbery**,

committed by a **Third Party**.

**Insuring Clause (C): In Transit Coverage**

(C) The Company shall pay the **Parent Organization** for direct loss sustained by an **Insured** resulting from:

(1) **Robbery** or unlawful taking of **Money** or **Securities** committed by a **Third Party**; or

(2) actual destruction or disappearance of **Money** or **Securities**;

while **In Transit** or while temporarily within the home of an **Employee** or a partner of an **Organization**.

Coverage under this Insuring Clause (C) shall also include:

(3) damage to **Property** which results from **Robbery** while **In Transit**; and

(4) loss by the unlawful taking of **Property** temporarily within the home of an **Employee** or a partner of an **Organization**,

committed by a **Third Party**.

**Insuring Clause (D): Forgery Coverage**

(D) The Company shall pay the **Parent Organization** for direct loss sustained by an **Insured** resulting from **Forgery** or alteration of a **Financial Instrument** committed by a **Third Party**.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

**Insuring Clause (E): Computer Fraud Coverage**

(E) The Company shall pay the **Parent Organization** for direct loss of **Money**, **Securities** or **Property** sustained by an **Insured** resulting from **Computer Fraud** committed by a **Third Party**.

**Insuring Clause (F): Funds Transfer Fraud Coverage**

(F) The Company shall pay the **Parent Organization** for direct loss of **Money** or **Securities** sustained by an **Insured** resulting from **Funds Transfer Fraud** committed by a **Third Party**.

**Insuring Clause (G): Money Orders and Counterfeit Currency Fraud Coverage**

(G) The Company shall pay the **Parent Organization** for direct loss sustained by an **Insured** resulting from **Money Orders and Counterfeit Currency Fraud** committed by a **Third Party**.

**Insuring Clause (H): Credit Card Fraud Coverage**

(H) The Company shall pay the **Parent Organization** for direct loss sustained by an **Insured** resulting from **Credit Card Fraud** committed by a **Third Party**.

**Insuring Clause (I): Client Coverage**

(I) The Company shall pay the **Parent Organization** for direct loss of **Money**, **Securities** or **Property** sustained by a **Client** resulting from **Theft** or **Forgery** committed by an **Employee** not in collusion with such **Client's** employees.

**Insuring Clause (J): Expense Coverage**

(J) The Company shall pay the **Parent Organization** for:

(1) **Investigative Expenses** resulting from any direct loss covered under Insuring Clauses (A), Employee Theft Coverage; (B), Premises Coverage; (C), In Transit Coverage; (D), Forgery Coverage; (E), Computer Fraud Coverage; (F), Funds Transfer Fraud Coverage; (G), Money Orders and Counterfeit Currency Fraud Coverage; (H), Credit Card Fraud Coverage or (I), Client Coverage; or

(2) **Computer Violation Expenses** resulting from any direct loss covered under Insuring Clauses (A), Employee Theft Coverage, (E), Computer Fraud Coverage or (I), Client Coverage;

incurred by any **Organization** in the amount set forth in Item 2 of the Crime Declarations, solely if such covered direct loss is in excess of the Retention applicable to such covered loss. Such amount shall be part of and not in addition to the Limit of Liability applicable to such covered loss.

## II. DEFINITIONS

For purposes of this Coverage Part:

**Banking Premises** means the interior portion of a building occupied by, or the night depository chute or safe maintained by, any bank, trust company or similar financial institution.

**Client** means a customer of an **Organization** to whom an **Organization** provides goods or services under written contract or for a fee.

**Computer Fraud** means the unlawful taking of **Money**, **Securities** or **Property** resulting from a **Computer Violation**.

**Computer System** means a computer or network of computers, including its input, output, processing, storage and communication facilities, and shall include off-line media libraries.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

**Computer Violation** means an unauthorized:

(A)    entry into or deletion of **Data** from a **Computer System**;

(B)    change to **Data** elements or program logic of a **Computer System**, which is kept in machine readable format; or

(C)    introduction of instructions, programmatic or otherwise, which propagate themselves through a **Computer System**,

directed solely against an **Organization**.

**Computer Violation Expenses** means reasonable expenses, other than an **Organization's** internal corporate costs (such as **Salary**), incurred by an **Organization** with the Company's prior written consent to reproduce or duplicate damaged or destroyed electronic **Data** or computer programs. If such computer programs cannot be duplicated from other computer programs, then **Computer Violation Expenses** shall also include reasonable costs incurred for computer time, computer programmers, technical experts or consultants to restore the computer programs to substantially the same level of operational capability immediately preceding the covered direct loss. **Computer Violation Expenses** shall not include expenses incurred by any **Client**.

**Contractual Independent Contractor** means any natural person independent contractor while in the regular service of an **Organization** in the ordinary course of such **Organization's** business, pursuant to a written contract between such **Organization**, and either (A) such natural person independent contractor, or (B) any other entity acting on behalf of such natural person independent contractor, for services.

**Credit Card Fraud** means the **Forgery** or alteration of, on or in, any written instrument required in connection with any credit card issued to an **Organization** or at the request of an **Organization**, to any partner, officer or **Employee** of an **Organization**.

**Data** means information contained in records, manuscripts, accounts, microfilms, tapes or other records, which are processed and stored in a **Computer System**.

**Discovery** or **Discovered** means knowledge acquired by an **Executive** or **Insurance Representative** of an **Insured** which would cause a reasonable person to believe a covered loss has occurred or an occurrence has arisen that may subsequently result in a covered loss. This includes loss:

(A)    sustained prior to the inception date of any coverage under this Coverage Part;

(B)    which does not exceed the Retention set forth in Item 2 of the Crime Declarations; or

(C)    the exact amount or details of which are unknown,

provided that **Discovery** or **Discovered** shall not include knowledge acquired by an **Executive** or **Insurance Representative** of an **Insured** acting alone or in collusion with an **Employee**, or the knowledge possessed by any **Executive** or **Insurance Representative** who is a participant in the **Theft** or **Forgery**.

**Employee** means any:

(A)    natural person in the regular service of an **Organization** in the ordinary course of such **Organization's** business, whom such **Organization** governs and directs in the performance of such service, including a part-time, seasonal, leased and temporary employee, intern or volunteer;

(B)    **Executive** while performing acts within the scope of the usual duties of an **Employee**;

(C)    **Contractual Independent Contractor**;

(D)    natural person fiduciary, trustee, administrator or **Employee**, as defined in Subsections (A) and (B) of this definition, of an **ERISA Plan** and any other natural person, who any of which handle **ERISA Plan** assets and are required to be bonded by an **Organization** in connection with such **ERISA Plan** by Title 1 of the Employee Retirement Income Security Act of 1974, as amended, and as amended by the Pension Protection Act of 2006;

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

(E) former or retired **Employee**, as defined in Subsections (A) and (B) of this definition, of the **Organization**, retained as a consultant (as evidenced by a written contract for services) to the **Organization**; or

(F) **Employee**, as defined in Subsections (A) and (B) of this definition, of the **Organization**, while on leave for military services.

**ERISA Plan** means any Employee Benefit Plan, Pension Benefit Plan or Welfare Benefit Plan, defined and required to be bonded under Title 1 of the Employee Retirement Income Security Act of 1974, as amended, and as amended by the Pension Protection Act of 2006, which is operated solely by an **Organization** or jointly by an **Organization** and a labor organization for the benefit of **Employees** and which existed on or before the inception of this Policy or which is created or acquired after the inception of this Policy, provided that **ERISA Plan** shall not include any multi-employer plan.

**Executive** means any natural person specified below:

(A) a duly elected or appointed director, officer, trustee, in-house general counsel or duly constituted committee member of any **Organization** incorporated in the United States of America;

(B) a duly elected or appointed: (1) manager or member of the Board of Managers or equivalent position; (2) duly constituted committee member; (3) in-house general counsel; or (4) trustee, of any **Organization** formed as a limited liability company in the United States of America; or

(C) a holder of an equivalent position to those described in Subsections (A) or (B) above in any **Organization** incorporated, formed or organized anywhere in the world.

**Financial Instrument** means checks, drafts or similar written promises, orders or directions to pay a sum certain in money, that are made, drawn by or drawn upon an **Organization** or by anyone acting as an **Organization's** agent, or that are purported to have been so made or drawn.

**Forgery** means the signing of another natural person's name with the intent to deceive, but does not mean a signature that includes, in whole or in part, one's own name, with or without authority, in any capacity for any purpose. Mechanically or electronically produced or reproduced signatures shall be treated the same as hand-written signatures.

**Funds Transfer Fraud** means fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions (other than **Forgery**), purportedly issued by an **Organization**, and issued to a financial institution directing such institution to transfer, pay or deliver **Money** or **Securities** from any account maintained by such **Organization** at such institution, without such **Organization's** knowledge or consent.

**Insurance Representative** means an **Employee**, as defined in Subsections (A) and (B) of the definition of **Employee**, including a risk manager, designated to represent an **Insured** for the purpose of effecting and maintaining insurance.

**Insured** means any **Organization** and any **Sponsored Plan**.

**In Transit** means being conveyed outside the **Premises**, from one person or place to another, by the **Organization** within the custody of:

(A) an **Employee** or a partner of an **Organization**; or

(B) a person duly authorized by such **Organization** to have custody of **Money**, **Securities** or **Property**,

provided that such conveyance begins immediately upon receipt of **Money**, **Securities** or **Property** by the person(s) described in Subsections (A) or (B) above, from such **Organization**, and ceases immediately upon delivery to the designated recipient or its agent.

**Investigative Expenses** means reasonable expenses, other than an **Organization's** internal corporate costs (such as **Salary**), incurred by an **Organization** with the Company's prior written consent to establish the existence and amount of a covered loss. **Investigative Expenses** shall not include expenses incurred by any **Client**.

**Money** means currency, coin, bank notes and bullion.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

**Money Orders and Counterfeit Currency Fraud** means the good faith acceptance by an **Organization**:

(A) in exchange for merchandise, **Money** or services, of any post office or express money order, issued or purporting to have been issued by any post office or express company, if such money order is not paid upon presentation; or

(B) in the regular course of business, of counterfeit paper currency.

**Non-ERISA Plan** means any employee benefit plan not subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended, and as amended by the Pension Protection Act of 2006, which is operated solely by an **Organization** or jointly by an **Organization** and a labor organization for the benefit of **Employees** and which existed on or before the inception of this Policy or which is created or acquired after the inception of this Policy, provided that **Non-ERISA Plan** shall not include any multi-employer plan.

**Premises** means the interior portion of a building occupied by an **Organization** in conducting its business.

**Property** means tangible property other than **Money** or **Securities**.

**Robbery** means the unlawful taking of **Money**, **Securities** or **Property** from the custody of an **Employee** or other person (except a person acting as a watchman, porter or janitor) duly authorized by an **Organization** to have custody of such **Money**, **Securities** or **Property**, by violence or threat of violence, committed in the presence and cognizance of such **Employee** or other person.

**Safe Burglary** means the unlawful taking of **Money**, **Securities** or **Property** by forcible or violent entry evidenced by visible marks, from a locked vault or safe located within the **Premises**.

**Salary** means compensation an **Organization** pays an **Employee**, including bonus, commission, incentive payments, and the cost of health, welfare and pension benefits.

**Securities** means any negotiable and non-negotiable instruments representing either **Money** or **Property**, including revenue and other stamps in current use, casino chips, tokens and tickets, provided that **Securities** shall not include **Money**.

**Sponsored Plan** means any **ERISA Plan** and **Non-ERISA Plan**.

**Theft** means the unlawful taking of **Money**, **Securities** or **Property** to the deprivation of:

(A) an **Insured**, solely for the purposes of Insuring Clause (A), Employee Theft Coverage; or

(B) a **Client**, solely for the purposes of Insuring Clause (I), Client Coverage.

**Third Party** means a natural person other than:

(A) an **Employee**; or

(B) a natural person acting in collusion with an **Employee**.

## III. EXCLUSIONS

(A) No coverage will be available for:

(1) Trading
loss resulting directly or indirectly from any authorized or unauthorized trading of **Money**, **Securities** or **Property**, whether or not in the name of an **Insured** and whether or not in a genuine or fictitious account, provided that this Exclusion (A)(1) shall not apply to direct losses caused by **Theft** or **Forgery** which result in improper financial gain to an **Employee** (direct losses as used herein shall mean only the amount of improper financial gain to such **Employee**, which shall not include **Salary**, commissions, fees or other compensation, including promotions and raises associated with employment, paid by the **Insured** to such **Employee**);

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

(2) Trade Secrets/Confidential Information
loss of trade secrets, confidential processing methods or other confidential information of any kind;

(3) Partner
loss due to **Theft** or **Forgery** committed by a partner of an **Organization**, whether acting alone or in collusion with others, provided that if such **Theft** or **Forgery** would otherwise be covered under Insuring Clause (A), Employee Theft Coverage, or (I), Client Coverage, this Exclusion (A)(3) shall not apply to the extent coverage under this Coverage Part is excess of the amount of such partner's percentage ownership of such **Organization**, on the day immediately preceding the date of **Discovery**, multiplied by such **Organization's** total assets as reflected in such **Organization's** most recent audited financial statements;

(4) War
loss or damage due to declared or undeclared war, civil war, insurrection, rebellion, revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization, or any act or condition incident to any of the foregoing;

(5) Nuclear
loss or damage due to nuclear reaction, nuclear radiation or radioactive contamination, or any act or condition incident to any of the foregoing;

(6) Potential Income
loss of income not realized as the result of a covered loss;

(7) Indirect/Consequential
indirect or consequential loss of any kind, provided that this Exclusion (A)(7) shall not apply to:

(a) otherwise covered **Investigative Expenses** and **Computer Violation Expenses** under Insuring Clause (J), Expense Coverage; or

(b) the cost of reproducing information contained in any lost or damaged manuscripts, records, accounts, microfilms, tapes, or other records resulting directly from a covered loss, provided that the Company's maximum liability for the cost of reproducing information contained in any lost or damaged manuscripts, records, accounts, microfilms, tapes, or other records resulting directly from a covered loss sustained shall be $25,000, which amount shall be part of, and not in addition to, the applicable Limit of Liability set forth in Item 2 of the Crime Declarations.

(8) Data Fees, Costs or Expenses
fees, costs or expenses incurred or paid:

(a) as a result of the reconstitution of **Data** if an **Organization** knowingly used illegal copies of programs;

(b) to render the **Data** usable by replacement processing equipment;

(c) to design, update or improve software or programs or to perfect their operation or performance; or

(d) as a result of an alteration in **Data** held on magnetic media due to the effect of magnetic fields, their incorrect use or the obsolescence of the computer or its facilities;

(9) Fire
loss due to fire, provided that this Exclusion (A)(9) shall not apply to:

(a) loss of **Money** or **Securities**; or

(b) damage to any safe or vault caused by the application of fire thereto for the purposes of **Safe Burglary**;

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

(10) Legal Fees, Costs or Expenses
fees, costs or expenses incurred or paid in defending or prosecuting any legal proceeding or claim, provided that this Exclusion (A)(10) shall not apply to the coverage provided under Section V, Legal Expenses Extension;

(11) Voluntary Exchange or Purchase
loss due to an **Insured** knowingly having given or surrendered **Money, Securities** or **Property** in any exchange or purchase with a **Third Party**, not in collusion with an **Employee**, provided that this Exclusion (A)(11) shall not apply to otherwise covered loss under Insuring Clauses (A), Employee Theft Coverage, (G), Money Orders and Counterfeit Currency Fraud Coverage, or (I), Client Coverage, or otherwise covered loss of **Property** under Insuring Clause (E), Computer Fraud Coverage;

(12) Advantage
loss sustained by one **Insured** to the advantage of any other **Insured**;

(13) Custodial
loss of or damage to **Money, Securities** or **Property** while in the custody of any bank, trust company, similar recognized place of safe deposit, armored motor vehicle company or any person who is duly authorized by an **Organization** to have custody of such **Money, Securities** or **Property**, provided that this Exclusion (A)(13) shall not apply to the extent that coverage under this Coverage Part is excess of the amount recovered or received by such **Organization** under:

    (a) such **Organization's** contract, if any, with, or insurance carried by, any of the foregoing; or

    (b) any other insurance or indemnity in force which would cover the loss in whole or in part; or

(14) Authorized Representative
loss or damage due to **Theft, Forgery, Computer Fraud, Funds Transfer Fraud, Money Orders And Counterfeit Currency Fraud, Credit Card Fraud** or other fraudulent, dishonest or criminal act (other than **Robbery** or **Safe Burglary**) committed by any authorized representative of an **Insured**, whether acting alone or in collusion with others, provided that this Exclusion (A)(14) shall not apply to otherwise covered loss under Insuring Clauses (A), Employee Theft Coverage, or (I), Client Coverage, resulting from **Theft** or **Forgery** committed by an **Employee** acting in collusion with such authorized representative.

(B) In addition to the Exclusions in Subsection (A) above, no coverage will be available under:

    (1) Insuring Clauses (A), Employee Theft Coverage, or (I), Client Coverage, for:

        (a) Broker/Independent Contractor
loss caused by any broker, factor, commission merchant, consignee, contractor, independent contractor (other than a **Contractual Independent Contractor**), or other agent or representative of the same general character;

        (b) Prior Dishonesty
loss caused by an **Employee** which is sustained by an **Insured**:

            (i) after an **Executive** or **Insurance Representative** becomes aware of a:

                (1) **Theft**;

                (2) **Forgery**; or

                (3) other fraudulent, dishonest or criminal act,

            which is valued at one thousand dollars ($1,000) or more, committed by such **Employee** while employed with or in the service of an **Insured**;

4:22-cv-00889-JD Date Filed 03/17/22 Entry Number 1-1 Page 59 of 73

CHUBB Chubb Group of Insurance Companies
202B Hall's Mill Road
Whitehouse Station, NJ 08889

***ForeFront Portfolio 3.0[SM]***
***Crime Coverage Part***

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

(ii) after an **Executive** or **Insurance Representative** becomes aware of a **Theft**, **Forgery** or other fraudulent, dishonest or criminal act, involving:

(1) **Money**;

(2) **Securities**; or

(3) other property,

which is valued at twenty-five thousand dollars ($25,000) or more, committed by such **Employee** prior to employment or service with an **Insured**; or

(iii) more than ninety (90) days following the termination of such **Employee**;

(2) Insuring Clause (B), Premises Coverage, or (C), In Transit Coverage, for:

(a) Other Insuring Clauses
loss or damage due to **Forgery**, **Computer Fraud**, **Funds Transfer Fraud**, **Money Orders and Counterfeit Currency Fraud** or **Credit Card Fraud**; or

(b) Mail/Carrier for Hire
loss of or damage to **Money**, **Securities** or **Property** while in the mail or in the custody of a carrier for hire other than an armored motor vehicle company;

(3) Insuring Clauses (B), Premises Coverage, (C), In Transit Coverage, (E), Computer Fraud Coverage, or (F), Funds Transfer Fraud Coverage, for:

(a) Kidnap, Ransom or Extortion
loss or damage as a result of a kidnap, ransom or other extortion payment (as distinct from **Robbery**) surrendered to any person as a result of a threat to do bodily harm to any person or a threat to do damage to the **Premises** or other property;

(4) Insuring Clause (D), Forgery Coverage, for:

(a) Forgery or Alteration
loss due to **Forgery** or alteration of:

(i) any **Financial Instrument** committed by any **Third Party** in collusion with any **Employee**; or

(ii) any registered or coupon obligations issued or purported to have been issued by the **Insured**, or any coupons whether attached or detached; or

(5) Insuring Clause (H), Credit Card Fraud Coverage, for:

(a) Forgery or Alteration (Credit Card)
loss caused by any forgery or alteration of, on or in any written instrument, provided that this Exclusion (B)(5) shall not apply if:

(i) the provisions, conditions and other terms under which the involved credit card was issued were fully complied with; and

(ii) the **Organization** is legally liable to the issuer of such credit card for such loss.

(C) Loss Sustained Option
In addition to the Exclusions in Subsections (A) and (B) above and if the Loss Sustained option is purchased, as set forth in Item 3 of the Crime Declarations, no coverage will be available for:

(1) loss unless sustained by any **Insured** prior to the termination of this Coverage Part as to such **Insured** and **Discovered** and written notice thereof is given to the Company within sixty (60) days following such termination;

14-02-17277 (12/2010) Page 8 of 14

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

(2) loss unless sustained prior to the termination of any Insuring Clause or any particular coverage offered under any Insuring Clause and **Discovered** and written notice thereof is given to the Company within sixty (60) days following such termination; or

(3) loss unless sustained prior to the termination of this Coverage Part in its entirety, and **Discovered** and written notice thereof is given to the Company:

(a) within sixty (60) days following such termination, if this Coverage Part is not renewed with the Company;

(b) prior to such termination, if this Coverage Part is renewed with the Company; or

(c) within one (1) year following such termination, if the termination results from the voluntary liquidation or voluntary dissolution of the **Parent Organization**.

(D) Loss Discovered Option
In addition to the Exclusions in Subsections (A) and (B) above and if the Loss Discovered option is purchased, as set forth in Item 3 of the Crime Declarations, no coverage will be available for:

(1) loss unless sustained by any **Insured**, and **Discovered** prior to the termination of this Coverage Part as to such **Insured**;

(2) loss unless sustained, and **Discovered** prior to the termination of any Insuring Clause or any particular coverage offered under any Insuring Clause;

(3) loss unless sustained, and **Discovered** prior to the termination of this Coverage Part in its entirety;

(4) loss unless sustained prior to the termination of this Coverage Part and **Discovered** within one (1) year following such termination if the termination results from the voluntary liquidation or voluntary dissolution of the **Parent Organization**; or

(5) any loss that an **Insured** is aware of prior to the inception date of this Policy,

provided that in no event will coverage be available under this Coverage Part for such loss if such loss is covered under any renewal or replacement of this Coverage Part or any Insuring Clause or any particular coverage offered under any Insuring Clause.

## IV. ERISA PLAN EXTENSION

(A) Solely with respect to loss sustained by an **ERISA Plan**, payment by the Company for covered loss shall be to the **ERISA Plan** sustaining such loss. If such payment is in excess of the amount of coverage required by the Employee Retirement Income Security Act of 1974, as amended, for such **ERISA Plan(s)**, such excess shall be held for the use and benefit of any other named **ERISA Plan(s)** should such **ERISA Plan(s)** also discover loss recoverable hereunder.

(B) With respect to each **ERISA Plan**:

(1) if covered loss is sustained by any **ERISA Plan** which does not have any employer securities, the Limit of Liability applicable to such covered loss shall be the greater of:

(a) $1,000; or

(b) ten percent (10%) of the **ERISA Plan's** funds handled as of the beginning of such **ERISA Plan's** fiscal year,

up to $500,000; or

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

(2) if covered loss is sustained by any **ERISA Plan** which does have any employer securities, the Limit of Liability applicable to such covered loss shall be the greater of;

(a) $1,000; or

(b) ten percent (10%) of the **ERISA Plan's** funds handled as of the beginning of such **ERISA Plan's** fiscal year,

up to $1,000,000,

provided that, in all events, if the applicable Limit of Liability set forth in Item 2(A) of the Crime Declarations:

(i) is less than or equal to the amounts set forth in Paragraphs (B)(1) or (B)(2) above, then the applicable Limit of Liability shall be amended to the respective amounts set forth in Paragraphs (B)(1) or (B)(2) above; or

(ii) is greater than the amounts set forth in Paragraphs (B)(1) or (B)(2) above, then the applicable Limit of Liability for each **ERISA Plan** shall be the amounts set forth in Paragraphs (B)(1) or (B)(2) above, with the remaining limit in the amount by which the applicable Limit of Liability set forth in Item 2(A) of the Crime Declarations exceeds the amounts in Paragraphs (B)(1) or (B)(2) above to be allocated equally between all **ERISA Plans** sustaining the loss.

(C) Solely with respect to loss sustained by an **ERISA Plan**:

(1) Insuring Clause (A), Employee Theft Coverage, is replaced with the following:

The Company shall pay an **ERISA Plan** for direct loss of **Money, Securities** or **Property** sustained by such **ERISA Plan** resulting from a fraudulent or dishonest act, including larceny, theft, embezzlement, forgery, misappropriation, wrongful abstraction, wrongful conversion and willful misapplication, committed by an **Employee** acting alone or in collusion with others.

(2) The words "sixty (60) days" are deleted from the exclusions applicable to this Coverage Part wherever they appear, and the words "one (1) year" are substituted in place thereof.

(D) No Retention shall apply to loss sustained by an **ERISA Plan** covered under this Coverage Part.

## V. LEGAL EXPENSES EXTENSION

In addition to the Limits of Liability set forth in the Crime Declarations, the Company shall pay the **Parent Organization**:

(A) as a result of loss covered under Insuring Clause (D), Forgery Coverage, reasonable court costs and attorneys' fees incurred and paid, with the Company's prior written consent, in defending an **Organization** or an **Organization's** bank in any legal proceeding brought against it to enforce payment of a **Financial Instrument**; and

(B) as a result of loss covered under Insuring Clause (H), Credit Card Fraud Coverage, reasonable court costs and attorneys' fees incurred and paid with the Company's prior written consent in defending an **Organization** in any legal proceeding brought against it to enforce payment of a written instrument, required in connection with any credit card.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

## VI. PROOF OF LOSS AND LEGAL PROCEEDINGS

(A) Knowledge possessed by any **Insured** or **Discovery** shall be deemed knowledge possessed by or **Discovery** by all **Insureds**.

(B) It is a condition precedent to coverage hereunder that, upon **Discovery**, the **Parent Organization** will:

(1) give written notice to the Company at the earliest practicable moment, and in no event later than 180 days after such **Discovery**;

(2) furnish affirmative proof of loss with full particulars to the Company at the earliest practicable moment, and in no event later than 180 days after such **Discovery**;

(3) submit to examination under oath at the Company's request;

(4) produce all pertinent records at such reasonable times and places as the Company shall designate; and

(5) provide full cooperation with the Company in all matters pertaining to a loss or claim.

(C) The **Parent Organization** may offer a comparison between an **Organization's** inventory records and actual physical count of its inventory to prove the amount of loss, only where an **Organization** establishes wholly apart from such comparison that it has sustained a covered loss, caused by an **Employee**.

(D) No **Insured** shall institute legal proceedings against the Company:

(1) after two (2) years immediately following any **Discovery**; or

(2) to recover a judgment or settlement against it or its bank resulting from **Forgery**, **Credit Card Fraud** or related legal expenses as set forth in Section V, Legal Expenses Extension, after two (2) years immediately following the date upon which such judgment shall become final or settlement was entered.

## VII. LIMITS OF LIABILITY

(A) The Company's maximum liability for each loss shall not exceed the Limit of Liability applicable to such loss set forth in Item 2 of the Crime Declarations, regardless of the number of **Insureds** sustaining the loss, provided that with respect to an **ERISA Plan**, the Limit of Liability shall apply in accordance with the terms of Section IV, ERISA Plan Extension.

(B) If a direct loss is covered under more than one Insuring Clause, the maximum amount payable under this Coverage Part shall not exceed the largest applicable Limit of Liability of any such Insuring Clause.

(C) All loss resulting from a single act or any number of acts of the same **Employee** or **Third Party**, and all loss whether such act or acts occurred before or during the **Policy Period**, will be treated as a single loss and the applicable Limit of Liability set forth in Item 2 of the Crime Declarations will apply, subject to Section X, Liability for Prior Losses.

## VIII. RETENTION

(A) The Company's liability under this Coverage Part shall apply only to that part of each loss which is in excess of the applicable Retention set forth in Item 2 of the Crime Declarations.

(B) If an **Insured** receives payment under another policy or bond, after applying a deductible or retention, for loss also covered hereunder, then the applicable Retention set forth in Item 2 of the Crime Declarations shall be reduced by the deductible or retention previously applied to such loss.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

## IX. OWNERSHIP

(A) Solely for the purposes of Insuring Clauses (A), Employee Theft Coverage; (B), Premises Coverage; (C), In Transit Coverage; (D), Forgery Coverage; (E), Computer Fraud Coverage; (F), Funds Transfer Fraud Coverage; (G), Money Orders and Counterfeit Currency Fraud Coverage and (H), Credit Card Fraud Coverage, the Company's liability under this Coverage Part shall only apply to **Money**, **Securities** or **Property** owned by an **Organization** or for which the **Organization** is legally liable, or held by the **Organization** in any capacity whether or not the **Organization** is liable, provided that:

(1) the Company's liability will not apply to damage to the **Premises** unless the **Organization** is the owner of such **Premises** or is legally liable for such damage; or

(2) with respect to Insuring Clause (A), Employee Theft Coverage, the Company's liability will not apply to **Money**, **Securities** or **Property** of a **Client**.

(B) Solely for the purposes of Insuring Clause (I), Client Coverage, the Company's liability under this Coverage Part will only apply to **Money**, **Securities** or **Property**:

(1) owned by a **Client**, which is held by an **Organization** in any capacity or for which the **Organization** is legally liable; or

(2) held or owned by a **Client**, for which the **Client** is legally liable.

## X. LIABILITY FOR PRIOR LOSSES

(A) If the Loss Sustained option is purchased as set forth in Item 3 of the Crime Declarations:

(1) coverage will be available for loss sustained prior to the inception date of this Policy, or the effective date of coverage for any additional **Insureds**, or the effective date of any coverage added by endorsement, subject to the following:

(a) an **Organization** or some predecessor in interest of such **Organization** carried a prior bond or policy, which at the time such prior loss was sustained, afforded some or all of the coverage of an Insuring Clause under this Coverage Part applicable to such prior loss;

(b) such coverage continued without interruption from the time such loss was sustained until the inception date or effective date(s) specified above;

(c) such prior loss was first **Discovered** by an **Insured** after the time allowed for discovery under the last such bond or policy; and

(d) some or all of the coverage of an Insuring Clause under this Coverage Part would be applicable to such prior loss;

(2) if such prior bond or policy carried by an **Insured** or predecessor in interest of such **Insured** was issued by the Company or any subsidiary or affiliate of The Chubb Corporation, such prior bond or policy shall terminate as of the inception of this Policy and such prior bond or policy shall not cover any loss not discovered and noticed to the Company prior to the inception of this Policy, provided that this Paragraph (2) shall not apply to:

(a) any loss (i) sustained in its entirety and discovered prior to the inception date of this Policy, and (ii) notified to the Company in writing on or after the inception date of this Policy, provided such notice is in accordance with any applicable reporting, notice or exclusionary provision of the Crime coverage section of such prior bond or policy; or

(b) any loss (i) sustained in its entirety prior to the inception date of this Policy, (ii) and discovered and notified to the Company in writing within sixty (60) days following termination of the Crime coverage section of such prior bond or policy, provided such notice is in accordance with any applicable reporting, notice or exclusionary provision of the Crime coverage section of such prior bond or policy; and

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

(3) An **Insured** shall neither be entitled to a separate recovery under each policy in force at the time any part of the prior loss was sustained, nor shall the **Insured** be entitled to recover the sum of the limits of liability of any such policies. The Company's maximum liability for the prior loss shall not exceed the lesser of either the limit of liability of the policy immediately preceding this Coverage Part under which part of the prior loss was sustained, or the applicable Limit of Liability set forth in Item 2 of the Crime Declarations.

(B) If the Loss Discovered option is purchased as set forth in Item 3 of the Crime Declarations:

(1) coverage will be available for loss sustained at any time and **Discovered** during the **Policy Period**, provided that coverage for loss sustained prior to the effective date of this Coverage Part, or the effective date of coverage for any additional **Insureds**, or the effective date of any coverage added by endorsement, is subject to the following:

(a) if an **Organization** or some predecessor in interest of such **Organization** carried a prior bond or policy which afforded coverage for a loss sustained during the period of such prior bond or policy and such prior bond or policy was not issued by the Company or any subsidiary or affiliate of The Chubb Corporation and such loss was first **Discovered** by an **Insured** prior to the expiration of the time allowed for discovery under the last such policy, then no coverage shall be available under this Coverage Part, unless the total amount of covered loss exceeds the limit of liability of the last such bond or policy carried by the **Organization** or predecessor in interest of such **Organization**, and the Company's Limit of Liability for any such loss will be in excess of the limit of liability of the last bond or policy subject to all of the terms and conditions of this Coverage Part; or

(b) if an **Organization** or some predecessor in interest of such **Organization** carried a prior bond or policy which afforded coverage for a loss sustained during the period of such prior bond or policy and such prior bond or policy was issued by the Company or any subsidiary or affiliate of The Chubb Corporation then such prior bond or policy shall terminate as of the inception of this Policy and such prior bond or policy shall not cover any loss not discovered and noticed to the Company prior to the inception of this Policy and then the Company's Limit of Liability for such loss shall be the applicable Limit of Liability set forth in Item 2 of the Crime Declarations.

## XI. NON-ACCUMULATION OF LIABILITY

(A) When there is more than one **Insured**, the maximum liability of the Company for loss sustained by one or all **Insureds** shall not exceed the amount for which the Company would be liable if all losses were sustained by any one **Insured**.

(B) Regardless of the number of years this coverage remains in effect and the total premium amounts due or paid, the limit of liability of the Company with respect to any loss shall not be cumulative from **Policy Year** to **Policy Year** or from **Policy Period** to **Policy Period**.

## XII. OTHER INSURANCE

If an **Insured** or any other party in interest in any loss covered by this Coverage Part has any bond, indemnity or insurance which would cover such loss in whole or in part in the absence of this Coverage Part, then this Coverage Part shall be null and void to the extent of the amount recoverable or received under such other bond, indemnity, or insurance; but this Coverage Part shall cover such loss, subject to its exclusions, conditions and other terms, only to the extent of the amount of such loss in excess of the amount recoverable or received under such other bond, indemnity or insurance.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

## XIII. TERMINATION OF PRIOR BONDS OR POLICIES

Any prior bonds or policies issued by the Company or any subsidiary or affiliate of The Chubb Corporation shall terminate, if not already terminated, as of the inception of this Policy.

## XIV. VALUATION AND FOREIGN CURRENCY

The Company shall pay:

(A) the actual market value of lost, damaged or destroyed **Securities** at the closing price of such **Securities** on the business day immediately preceding the day on which a loss is **Discovered**; or the cost of replacing **Securities**, whichever is less, plus the cost to post a Lost Instrument Bond;

(B) the cost of blank books, pages or tapes or other blank materials to replace lost or damaged books of account or other records;

(C) the least of:

(1) the actual cash value of the **Property**; or

(2) the cost to repair or replace **Property**, other than precious metals, with that of similar quality and value,

at the time the **Parent Organization** complies with Section VI, Proof of Loss and Legal Proceedings, regarding the furnishing of proof of loss;

(D) the United States of America dollar value of foreign currency based on the rate of exchange published in *The Wall Street Journal* on the day loss involving foreign currency is **Discovered**; or

(E) the United States of America dollar value of any precious metals based on the amount published in *The Wall Street Journal* Cash Prices, Precious Metals, on the day loss involving such precious metals is **Discovered**.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

**ENDORSEMENT/RIDER**

Coverage Section: ForeFront Portfolio 3.0 Crime Coverage Part Federal

Effective date of
this endorsement/rider: April 1, 2019

Federal Insurance Company

Endorsement/Rider No. 1

To be attached to and
form a part of Policy No. 8242-5843

Issued to: Downwind Trading Co, Inc DBA Damons Grill of Myrtle Beach

---

TELEPHONE FRAUD COVERAGE ENDORSEMENT

In consideration of the premium charged, it is agreed that this Coverage Part is amended as follows:

(1) Item 2. of the Crime Declarations is amended to include the following:

| Item 2. Insuring Clauses Applicable to this Coverage Part: | Limits of Liability: | Retentions: |
|---|---|---|
| Telephone Fraud Coverage: Insuring Clause: | $250,000.00 | $2,500.00 |

(2) The following insuring clause is added:

Telephone Fraud Coverage Insuring Clause

The Company shall pay the **Parent Organization** for **Telephone Fraud Financial Loss** sustained by an **Insured** resulting from **Remote Access Fraud**.

(3) Section II, Definitions, of this Coverage Part is amended to include the following terms:

(a) **Calling Card** means a calling card access number or telephone credit card access number issued by a telecommunications company which gives the **Calling Card** customer access to and use of telecommunications services.

(b) **Remote Access Fraud** means the fraudulent infiltration and manipulation of the **Insured's Telephone System** from a remote location to gain access to outbound long distance telephone service.

(c) **Telephone Fraud Financial Loss** means toll and line charges the **Insured** is responsible for solely as a result of **Remote Access Fraud**.

(d) **Telephone System(s)** means PBX, CBX, Merlin, remote access (including DISA), and all related peripheral equipment or similar systems owned or leased by the **Insured** for purposes of voice based telecommunications.

(4) No coverage will be available under the Telephone Fraud Coverage Insuring Clause, for:

(a) loss or damage of **Money, Securities** or **Property** as a result of an extortion payment surrendered to any person as a result of a threat to do damage to the **Premises** or **Telephone System**; or

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

(b) loss caused by any use of a **Calling Card**.

(5) Section VI, Proof of Loss and Legal Proceedings, is amended to include the following:

With respect to the Telephone Fraud Coverage Insuring Clause, it is a condition precedent to coverage hereunder that upon **Discovery**, the **Parent Organization** will give written notice to the Company at the earliest practicable moment, and in no event later than sixty (60) days after the billing cut-off date shown in the first telephone service charge bill from the telephone carrier in which **Remote Access Fraud** is documented. However, coverage shall not apply to that portion of loss sustained beginning thirty (30) days from the billing cut-off date shown in the first telephone service charge bill from the telephone carrier in which **Remote Access Fraud** is documented. Upon actual knowledge of **Remote Access Fraud** the **Insured** shall take all reasonable steps to curtail the unauthorized use of the **Telephone System(s)** and otherwise mitigate the loss by notifying the installer(s) of the **Telephone System(s)** and the affected telephone carriers.

Within four (4) months after such **Discovery** the **Parent Organization** shall furnish to the Company affirmative proof of loss with full particulars. Legal proceedings for recovery of any loss hereunder shall not be brought after the expiration of two years from the discovery of such loss.

At the Company's request, the **Insured** shall submit to examination by the Company, subscribe the same under oath if required, and produce for the Company's examination all pertinent records at such reasonable times and places as the Company shall designate, and shall cooperate with the Company in all matters pertaining to any loss or claim.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

**ENDORSEMENT/RIDER**

Coverage Section: ForeFront Portfolio 3.0 Crime Coverage Part Federal

Effective date of
this endorsement/rider: April 1, 2019

Federal Insurance Company

Endorsement/Rider No. 2

To be attached to and
form a part of Policy No. 8242-5843

Issued to: Downwind Trading Co, Inc DBA Damons Grill of Myrtle Beach

---

RECOVERIES SECTION ADDED ENDORSEMENT

In consideration of the premium charged, it is agreed that this Coverage Part is amended to include the following section:

**RECOVERIES**

(A) Recoveries for any loss covered under this Coverage Part, whether effected by the Company or by an **Insured**, less the cost of recovery, shall be distributed as follows:

(1) first, to an **Insured** for the amount of such loss, otherwise covered, in excess of the applicable Limits of Liability;

(2) second, to the Company for the amount of such loss paid to an **Insured** as covered loss;

(3) third, to an **Insured** for the Retention applicable to such loss;

(4) fourth, to an **Insured** for the amount of such loss not covered under this coverage section.

(B) Recovery from reinsurance or indemnity of the Company shall not be deemed a recovery hereunder.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

**ENDORSEMENT/RIDER**

Coverage Section: ForeFront Portfolio 3.0 Crime Coverage Part Federal

Effective date of
this endorsement: April 1, 2019

Company: Federal Insurance Company

Endorsement No. 3

To be attached to and
form a part of Policy No. 8242-5843

Issued to: Downwind Trading Co, Inc DBA Damons Grill of Myrtle Beach

---

## PRIVACY AND DATA BREACH EXCLUSIONS ENDORSEMENT

In consideration of the premium charged, it is agreed that:

1. Exclusion (A)(2) of Section III, Exclusions, of this Coverage Part is deleted.

2. No coverage will be available for:

    (i) loss involving the disclosure of an **Insured's** or another entity or person's confidential or personal information while in the care, custody or control of an **Insured** including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any similar type of nonpublic information;

    (ii) loss involving the use of another entity or person's confidential or personal information while in the care, custody or control of an **Insured** including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any similar type of nonpublic information; or

    (iii) fees, costs, fines, penalties or any other expenses incurred by an **Insured** which result, directly or indirectly, from the access to or disclosure of another entity or person's confidential or personal information, including but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any similar type of nonpublic information,

    provided, however, that the above exclusions 2(i) and 2(ii) shall not apply to loss that is otherwise covered under any Insuring Clause other than Insuring Clause (J), Expense Coverage.

3. The definition of **Property** in Section II, Definitions, of this Coverage Part shall not include any **Insured's** or another entity or person's confidential or personal information.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

All other terms, conditions and limitations of this policy shall remain unchanged.

Authorized Representative

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971

**ENDORSEMENT/RIDER**

Coverage Section: ForeFront Portfolio 3.0 Crime Coverage Part Federal

Effective date of
this endorsement/rider: April 1, 2019

Federal Insurance Company

Endorsement/Rider No. 4

To be attached to and
form a part of Policy No. 8242-5843

Issued to: Downwind Trading Co, Inc DBA Damons Grill of Myrtle Beach

---

FRAUDULENT INSTRUCTIONS EXCLUSION

In consideration of the premium charged, it is agreed that:

No coverage will be available under Insuring Clauses (B), (C), (D), (E), and (F) for loss resulting from any transfer, payment or delivery of **Money**, **Securities**, or **Property** approved by an **Employee** or arising out of any misrepresentation received by any **Employee**, agent, independent contractor or other representative of the **Insured**, whether such transfer, payment or delivery was made in good faith or as a result of trick, artifice, fraud or false pretenses.

The title and any headings in this endorsement/rider are solely for convenience and form no part of the terms and conditions of coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Authorized Representative

ELECTRONICALLY FILED - 2022 Feb 15 5:26 PM - HORRY - COMMON PLEAS - CASE#2022CP2600971